## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SIS, LLC,
     **Plaintiff,**

v.
                               **Civil Action No. 1:17-cv-01816-ELR**

STONERIDGE HOLDINGS, INC.,
ERIC NEWELL AND
SCOTT BOEDIGHEIMER,
     **Defendants.**

### PLAINTIFF'S SECOND AMENDED COMPLAINT

Plaintiff SIS, LLC ("Plaintiff"), through counsel, files this Second Amended Petition against Defendant Stoneridge Holdings, Inc. f/k/a Stoneridge Software, Inc., Eric Newell ("Newell") and Scott Boedigheimer ("Boedigheimer") (collectively, "Defendant") and respectfully states as follows:

### JURISDICTION AND VENUE

1.    The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(a), because this is a lawsuit in which over $75,000 is at issue and Plaintiff is a citizen of a state other than Stoneridge's state of citizenship.

2.    Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because, at all times relevant to this lawsuit, Defendants conducted substantial business in this District, was registered with the Georgia Secretary of State, had sufficient

minimum contacts with this District, and otherwise purposely availed itself of the markets in this District, through the promotion, sale, and marketing of their products and services in this District.

3.      In particular, Defendants marketed their services in the State of Georgia by way of an in person meeting (attended by Newell and Boedigheimer) in March 2014 and numerous calls and emails from Newell and Boedigheimer to Plaintiff's employees, who are located in Atlanta, Georgia.  Stoneridge entered into a nondisclosure contract with Plaintiff, a citizen of Georgia, as a part of its marketing efforts, and, later, contracted to perform services for Plaintiff in Georgia, among other places. Pursuant to the latter contract, representatives for Stoneridge attended a multi-day orientation and subsequently began work for Plaintiff at Plaintiff's offices in Atlanta, Georgia.   Newell and Boedigheimer supervised the employees providing those services in Atlanta, Georgia and communicated with Plaintiff's representatives located in Atlanta, Georgia about those services.  Defendants also employ a Georgia citizen who works from her home in Elijah, Georgia.

## **PARTIES**

4.      Plaintiff SIS, LLC is a Delaware limited liability corporation principal place of business in Atlanta, GA.

5.     Defendant Stoneridge Software Inc. is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  Stoneridge need not be served as it has already appeared and answered the lawsuit.

6.     Defendant Eric Newell is a citizen of Minnesota, residing in or near Minneapolis, Minnesota. He is the CEO and Founder of Stoneridge and may be served with this lawsuit and summons at Stoneridge's headquarters, located at 6465 Wayzata Blvd., Suite 775, Minneapolis, Minnesota 55426.

7.     Defendant Scott Boedigheimer is a citizen of Minnesota, residing in or near Minneapolis, Minnesota.  He is an officer of Stoneridge and may be served with this lawsuit and summons at Stoneridge's headquarters, located at 6465 Wayzata Blvd., Suite 775, Minneapolis, Minnesota 55426.

## FACTUAL BACKGROUND

8.     Plaintiff is a consulting company providing enterprise wide Microsoft software and software services.

9.     In March 2014, Plaintiff entered into final negotiations with APi Group, Inc. to become its prime service contractor with regard to APi Group Inc.'s implementation of multiple Microsoft software packages (the "APi Group Project").

10.     Shortly thereafter, in March and April 2014, Plaintiff engaged in discussions with Stoneridge, including those at an in-person meeting attended by

Newell and Bodhigheimer, to provide subcontracting services on the APi Group Project.  Plaintiff insisted that Stoneridge execute a non-disclosure agreement ("Confidentiality Agreement") to protect its burgeoning relationship with APi Group, Inc.  Stoneridge obliged.  A true and correct copy of the Confidentiality Agreement is attached hereto as Exhibit A.

11.    Under the Confidentiality Agreement, confidential information includes, but is not limited to, information about customers and potential customers and "other significant and valuable business information that would otherwise be considered to be 'trade secrets' under applicable law."  Confidentiality Agreement, "Confidential Information."  Stoneridge agreed to prevent any use of Confidential Information other than to facilitate discussions about a business relationship between the parties. *Id.*, Para. 2(A) and "Purpose of the Disclosure."  Stoneridge further agreed to indemnify and hold excess harmless from and against all claims, losses, liability, damages, expenses, and costs (including, without limitation, reasonable fees for attorneys, expert witnesses, and court costs) resulting from its breach of the Confidentiality Agreement. *Id.*, Para. 5.

12.    Subsequently, the Parties' subcontractor negotiations took place by, among other things, telephone calls and emails from Stoneridge directed to Plaintiff's representatives located in Atlanta, Georgia.  Newell and Boedigheimer handled negotiations for Stoneridge.

13.    By mid-June 2014, Plaintiff formalized its role in the APi Group Project.    Among other things, APi Group Inc. made Plaintiff its "Partner of Record," a term used by Microsoft to designate the partner who is responsible for serving an end-user's license or subscription to one of Microsoft's computer software programs or package of programs.    A designation of Partner of Record imposes certain obligations upon a partner, including, but not limited to, managing the overall customer relationship, providing customer support to the end-user, discussing deployment options, advising the end-user on questions regarding Microsoft products, assisting with the sale of new licenses, and upselling/cross-selling other related software.

14.    By July 2014, the Plaintiff and Defendants arrived at a meeting of the minds as to all key terms of the subcontract arrangement.    For Defendants part, Newell and Bodigheimer, in particular, specifically "agreed on billing and terms as well as the other issue, with a year buffer on working with our clients directly" as reflected in an email from Thomas to Newell, with a courtesy copy to Boedigheimer, dated July 14, 2014.    The parties' focus then turned to committing those terms to writing. On or about July 21, 2014, in a phone call attended by Maxwell Thomas of SIS and Newell and Boedigheimer of Stoneridge, the parties finalized the language of the written agreement and Stoneridge requested that Thomas revise the document accordingly and send it for signature.    On July 21,

2014, Thomas sent Stoneridge "signed and cleaned up [Subcontract Services and Statement of Work] agreements for your signature." The Subcontract Services Agreement attached to the email reflects the terms agreed to by the parties in their earlier phone call.  True and correct copies of these emails and agreements are fully incorporated herein and included as Exhibit B.

15.     Stoneridge's consultants began providing work directly for APi Group Inc. (rather than review of the APi Group Inc.-SIS Request for Proposal) just days later, on July 23, 2014.   Given Stoneridge's performance and based on Stoneridge's representations in the phone call and in the Statement of Work that "[d]elivery of the consulting services will commence upon signature by both parties," SIS presumed Stoneridge had signed the Subcontract Services Agreement and would be providing fully executed copies of it and the Statement of Work.

16.     The Subcontract Services Agreement provided that Stoneridge was to "modify and refine certain codes and to perform related services," defined as "Software Services." Exhibit B, ¶ 1.  These services were further defined by a Statement of Work proposed by Stoneridge and accepted by Plaintiff on or about July 20, 2014. *See* Exhibit B.

17.     Paragraph 14 of the Subcontract Services Agreement acknowledged the significant value of relationships between Plaintiff and its customers.   To protect that valuable asset, Stoneridge agreed, during the term of the Subcontract

Services Agreement and for a period of one year after the termination of the Agreement, it would not work directly with Plaintiff's customers to perform "any services or products offered for sale by [Plaintiff]," such services defined as "Competing Services."

18.     Stoneridge further acknowledged this non-solicitation provision of the Subcontract Services Agreement was reasonable and necessary to protect the Plaintiff's legitimate business interests and that any breach of the provision would result in significant and irreparable harm for which Plaintiff would have not adequate remedy at law.  Consequently, "in addition to any other remedies and damages available," Stoneridge agreed Plaintiff would be entitled to both injunctive relief and specific performance.

19.     Plaintiff's termination by a customer for "just cause" constituted the only exception to this non-solicitation agreement; in which case, Stoneridge would be free to work directly with the customer one year after the just cause termination.

20.     The Subcontract Services Agreement also contains a valid integration clause, providing that the Subcontract Services Agreement, including all exhibits thereto, contains the entire agreement and understanding of the Parties concerning the subject matter of the Subcontract Services Agreement.  Exhibit B at ¶ 11.

21.     Plaintiff has performed all conditions precedent under the Subcontract Services Agreement.

22.     Stoneridge engaged two consultants, one who traveled to Atlanta, Georgia and one who participated by phone, to undergo an APi Group Project orientation in July 2014.   Just days after the parties' finalized the written Subcontract Services Agreement, two of Stoneridge's consultants began providing Software Services on the APi Group Project as a subcontractor for Plaintiff. Stoneridge (and its consultants) were and are located in Minnesota as is APi Group Inc.   Stoneridge performed work under the Subcontract Services Agreement directly for APi Group Inc. (as opposed to orientation) in Minnesota.

23.     This work continued for some time as evidenced by an email of August 4, 2014 from Stoneridge's President, Eric Newell.  In the email, Newell acknowledges the parties' contract, referring to it as both the "subcontractor agreement" and "deal."  He makes no objection to the terms of the Subcontract Services Agreement.  He also refers to the parties negotiations in the past tense. Newell merely explains that Stoneridge has decided to stop providing services under the agreement because it had received less subcontract work than expected "when [it] originally _negotiated_ the deal."   (Emphasis added.)   He also acknowledges that the Subcontract Services Agreement makes no "promises" regarding the amount of work to be provided to Stoneridge.  A true and correct copy of the email is fully incorporated herein by reference and attached hereto as Exhibit C.

24.     Despite its agreement to the contrary, Stoneridge contracted and worked directly with APi Group Inc. during the term of the Subcontract Services Agreement.   Indeed, by January 2015, Stoneridge contracted directly with APi Group Inc. to perform the very services Plaintiff had provided and replaced Plaintiff as prime service contractor and Partner of Record for APi Group Inc. Project.

25.     Neither Plaintiff nor Stoneridge have terminated the Subcontract Services Agreement; thus, the customer non-solicitation provision remains in force. Likewise, APi Group Inc. remains a customer of Plaintiff as that term is used in the Agreement although the work Plaintiff has performed and will likely perform for APi Group Inc. is drastically smaller in scale than was initially agreed.

26.     As the result of Stoneridge's breach of the customer non-solicitation provision of the Agreement, Plaintiff has suffered lost profits in the amount of approximately $7 million it would otherwise have earned as part of the APi Group Project.

27.     Stoneridge's breach also required that Plaintiff take legal action—both formal, in the form of arbitration against ADEACA Corp., another Atlanta, Georgia-based business involved in the APi Group Project, and informal—to ensure receipt of incentive payments from Microsoft Plaintiff was to receive as Partner of Record for APi Group Inc.  Plaintiff has incurred damages in the amount

of approximately $65,000 as a result of these formal and informal legal proceedings, including, but not limited to, attorneys' fees and other dispute-related losses, costs and expenses.

28.    Finally, Plaintiff has suffered damage to reputation, damage to business relationships with ADEACA, Microsoft and APi Group Inc. and lost referrals as a result of Stoneridge's breach of the Agreement.  The full extent of these injuries is unknown at this time.

<u>**COUNT ONE– BREACH OF CONTRACT**</u>
**AGAINST STONERIDGE**

29.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

30.    The parties entered into the Subcontract Services Agreement which sets forth various obligations on the part of Stoneridge, particularly a duty to refrain from direct work and contracting with Plaintiff's customers during the Subcontract Services Agreement term and thereafter for a year.

31.    Stoneridge breached the Subcontract Services Agreement by working and contracting directly with APi Group Inc. during the Subcontract Services Agreement term.

32.    The Subcontract Services Agreement contains an integration clause, stating "This instrument contains the entire agreement between the parties regarding the subject matter of this Agreement."  The Subcontract Services

---

Agreement expressly prohibits Stoneridge's use of Plaintiff's trade secret and confidential information except for purposes of performing work under the agreement. Exhibit B, Subcontract Services Agreement ¶¶ 4 and 11. For this reason, it supersedes the Confidentiality Agreement.

33.    To the extent Defendants deny the existence, validity or enforceability of the Subcontract Services Agreement, however, the Non-Disclosure remains in full force and effect.  Defendants concede as much.

34.    Nevertheless, Defendants used Plaintiff's trade secret and confidential information for purposes other than to explore a business relationship with Plaintiff in breach of the Confidentiality Agreement—namely to contract directly with Plaintiff's customer, the APi Group.   More particularly, among other things, Defendants used specific, non-public information about APi Group's needs, preferences, business model and budget along with other customer-related information discerned by Plaintiff after a two-year, three hundred thousand dollar sales campaign to win APi Group Project business and through Request for Proposal information that APi Group provided to Plaintiff but not generally known in the industry; information about Plaintiff's services and relative strengths and weaknesses of Plaintiff's services in comparison to the services of Stoneridge and other competitors; and particularized software implementation strategies and techniques, including, but not limited to, how Plaintiff proposed to use the software

to provide certain functionalities and a confidential Work Order provided by Plaintiff to APi Group that reflected, among other things, pricing, scope of work, a project timeline, project phasing, project approach and strategy and other contractual terms such as APi Group's responsibilities for the project (collectively, "Plaintiff's Trade Secret and Confidential Information").

35.    Plaintiff's Trade Secret and Confidential Information is not generally known or readily ascertainable in the industry and, thus, provides Plaintiff a competitive advantage.  Plaintiff's Trade Secret and Confidential Information has been subject to reasonable efforts to maintain its secrecy, including Plaintiff's insistence that Stoneridge enter into a Confidentiality Agreement and, later, the Subcontract Services Agreement with its trade secret, confidentiality and non-solicitation provisions, before it shared Plaintiff's Trade Secret and Confidential Information with Defendants.

36.    Stoneridge's breach of these contracts has proximately resulted in significant damage to Plaintiff in an amount exceeding $7 million.

### COUNT TWO– IN THE ALTERNATIVE, PROMISSORY ESTOPPEL AGAINST STONERIDGE

37.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

38.    In a telephone call on or about July 14, 2014, Defendant's made a clear and definite promise to refrain from contracting directly with Plaintiff's

customers for a period of a year after the termination of a subcontract relationship between Plaintiff and Stoneridge.  In a subsequent telephone call on or about July 21, 2014, be bound by the written terms of the Subcontract Services Agreement as provided to by SIS to Stoneridge on July 21, 2014 for execution, particularly the non-solicitation provision.

39.    Stoneridge made these promises with the intention of inducing SIS to act on it in reliance.  SIS, in fact, justifiably relied on Stoneridge's promise, allowing Stoneridge access to APi Group Inc. and sensitive APi Group Project information.

40.    SIS has suffered pecuniary damages as a result of its reliance on Stoneridge's promise.  The promise must be enforced to prevent injustice.

### COUNT THREE– IN THE ALTERNATIVE, NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS

41.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

42.    Should the Court find a defect in the formation of the parties' subcontract services agreement, SIS seeks damages for the misrepresentations made by Defendants that they agreed to refrain from contracting directly with Plaintiff's customers for a period of a year after the termination of a subcontract relationship between Plaintiff and Stoneridge and the written terms of the

Subcontract Services Agreement as provided to Stoneridge on July 21, 2014 for execution, particularly the non-solicitation provision.

43.    Having voluntarily agreed to act as SIS's agent, as a subcontractor, Stoneridge owed SIS a duty of care in, among other things, representing its agreement to protect the business relationship between SIS and its customer, APi Group.  To the extent Defendants now deny having made such an agreement, their representations to the contrary on or about July 14 and 21, 2014 were false and constitute a failure by Defendants to exercise reasonable care in its communication of the information to SIS.  SIS justifiably relied on Defendants' false statements, allowing Defendant access to APi Group Inc. and sensitive APi Group Project information, particularly Plaintiff's Trade Secret and Confidential Information.

44.    SIS has suffered pecuniary damages as a result of its reliance on Defendants' false statements.

## COUNT FOUR– IN THE ALTERNATIVE, FRAUD
### AGAINST ALL DEFENDANTS

45.    Plaintiff realleges and incorporates by reference the foregoing paragraphs.

46.    Should the Court find a defect in the formation of the parties' subcontract services agreement, SIS seeks damages for the misrepresentations made by Defendants that they agreed to refrain from contracting directly with Plaintiff's customers for a period of a year after the termination of a subcontract

relationship between Plaintiff and Stoneridge and the written terms of the Subcontract Services Agreement as provided to Stoneridge on July 21, 2014 for execution, particularly the non-solicitation provision.

47.     To the extent Defendants now deny having reached such an agreement, their representations to the contrary on or about July 14 and 21, 2014 were false representations of an existing material fact susceptible of knowledge, made with the knowledge of its falsity and with the intention of inducing SIS to act on it in reliance.  SIS, in fact, justifiably relied on Defendant's false statements, allowing Defendants access to APi Group Inc. and sensitive APi Group Project information, particularly Plaintiff's Trade Secret and Confidential Information.

48.     SIS has suffered pecuniary damages as a result of its reliance on Defendants' false statements.

### COUNT FIVE– TORTIOUS INTERFERENCE
### WITH ECONOMIC ADVANTAGE
### AGAINST ALL DEFENDANTS

49.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

50.     Plaintiff had a reasonable expectation of economic advantage with regard to its contract with APi Group and the APi Group Project.  Defendants knew of the economic advantage and—in communications with both APi Group

and Microsoft about replacing Plaintiff as partner on the project—intentionally interfered with that expectation despite their promise to the contrary.

51.     In the absence of Defendants' wrongful acts, it is reasonably probable Plaintiff would have realized an economic advantage or benefit in the amount of $7.22 million in revenue from work with the APi Group; however, because of Defendants' wrongful acts, Plaintiff sustained damages in an amount exceeding $7 million.

## COUNT SIX– MISAPPROPRIATION OF TRADE SECRETS
### AGAINST ALL DEFENDANTS

52.     Plaintiff realleges and incorporates by reference the foregoing paragraphs.

53.     Plaintiff's Trade Secret and Confidential Information is not generally known or readily ascertainable in the industry and, thus, provides Plaintiff a competitive advantage.  Plaintiff's Trade Secret and Confidential Information has been subject to reasonable efforts to maintain its secrecy, including Plaintiff's insistence that Stoneridge enter into a Confidentiality Agreement and, later, the Subcontract Services Agreement with its trade secret, confidentiality and non-solicitation provisions, before it shared Plaintiff's Trade Secret and Confidential Information with Defendants.

---

54.     Plaintiff   provided   Defendants   Plaintiff's   Trade   Secret   and Confidential Information in the context of a confidential relationship both under the Confidentiality Agreement and the Subcontract Services Agreement.

55.     Defendants used Plaintiff's Trade Secret and Confidential Information to secure business directly from Plaintiff's customer, the APi Group.

56.     Plaintiff sustained damages in an amount exceeding $7 million as a result of Defendant's misappropriation of Plaintiff's Trade Secret and Confidential Information.

## CLAIM FOR FEES

57.     In addition to other damages, Plaintiff seeks to recover its attorneys' fees in this and the ADEACA-related litigation, expert witness fees and court costs under   the   Confidentiality   Agreement,   Minnesota   law   governing   tortious interference of an economic advantage causes of action and all other applicable agreements, case law or statutes.  Further, in addition to other damages, Plaintiff seeks to recover its attorneys' fees in this proceeding under the Subcontract Services Agreement, Minnesota law governing breach of contract, O.C.G.A. § 13-6-11 and/or all other applicable agreements, case law or statutes.

## CLAIM FOR PUNITIVE DAMAGES

58.     In addition to other damages, Plaintiff seeks to recover punitive damages because, in promising to protect Plaintiff's Trade Secret and Confidential

Information and to refrain from working directly with its customers for a period of one year after the termination of the subcontractor relationship between Plaintiff and Stoneridge with no intent to honor those promises but, instead, a desire to gain access to and misappropriate Plaintiff's customer, Defendants' acted willfully, with malice, fraud, wantonness, oppression and entirely want of care, raising the presumption of conscious indifference to the consequences of its action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a Judgment in its favor and against Defendants and award Plaintiff its underlying damages, punitive or punitive-type damages, its attorney and witness fees, costs, pre- and post-judgment interest, assignment of intellectual property created by Stoneridge for APi Group, which under the Subcontract Services Agreement is owned by Plaintiff as "work for hire," as well as any other relief that this Court deems just and appropriate.

DATED:

Respectfully submitted,

CHRISTIANSEN DAVIS, LLC

By: _____

Amy E. Davis (*pro hac vice* admission
pending)
State Bar No. 24007083
4100 Spring Valley Rd., Suite 450
Dallas, Texas 75244
Telephone: (214) 838-3501
Telecopy:  (972) 332-2306
adavis@cdfirm.com

STEVEN C. ROSEN

Steven C. Rosen
Attorney at Law
GA State Bar No. 614439
750 Hammond Drive
Bldg. 7, Suite 200
Atlanta, GA  30328
404-705-8000
stevencrosen@gmail.com

ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

This is to certify that on this _____ day of _____, 2017, a true and correct copy of the  foregoing document was served via electronic filing service upon counsel of record for Defendant.

Amy E. Davis

## **L.R. 7.1(D) CERTIFICATE OF FONT COMPLIANCE**

I hereby certify that the foregoing has been prepared with one of the font and point selections approved by the Court in Rule 5.1(c) of the Civil Local rules of Practice for the above-referenced Court, specifically, Times New Roman 14 point.

# EXHIBIT A

# MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement (the "Agreement") is effective as of the below Effective Date by and between SIS, LLC located at 3950 Shackleford Road, Suite 195, Duluth, Georgia ("SIS") and Stoneridge Software Inc. located at 8401 Wayzata Blvd, Suite 300, Minneapolis MN 55426.

"Confidential Information" means information and related materials (whether disclosed in writing, or orally) of the party making the disclosure (the "Disclosing Party") to the other party hereto (the "Receiving Party") that is identified as confidential (or, to a reasonable person, would be expected to be confidential) and disclosed after the Effective Date including, but not limited to: financial information or projections; business trends; lists of and information about suppliers, dealers, customers, potential customers, and associated statistical and financial information; designs, specifications and uses of products and services; product research; sales, marketing, business and strategic plans; and other significant and valuable business information that would otherwise be considered to be "trade secrets" under applicable law.

"Purpose of the Disclosure": To facilitate discussions about, and the evaluation and negotiation of, a potential business relationship between the parties hereto.
THE PARTIES HEREBY AGREE AS FOLLOWS:

1.    Property of Disclosing Party. All right, title and interest in and to the Confidential Information shall be and remain vested in Disclosing Party. Nothing in this Agreement shall grant Receiving Party any license or right of any kind with respect to the Confidential Information, other than to review, evaluate and use such information solely for the Purpose of the Disclosure set forth above.

2.    Receiving Party's Obligations.

    (A)  Receiving Party shall:

        (i) take steps to protect the Confidential Information (but in any case, not less than the efforts such party uses to protect its own confidential information and no less than a reasonable degree of care), and prevent any access to or reproduction, disclosure or use of any of the Confidential Information other than for the Purpose of the Disclosure and then only in strict compliance with the provisions hereof and subject to any applicable laws;

        (ii) disclose the Confidential Information only to those officers, directors and employees of Receiving Party who need to know such information in order to carry out the Purpose of the Disclosure and, in the event the employment of any such person is terminated, use reasonable efforts to recover any Confidential Information in such person's custody or control;

        (iii) not remove any copyright notice, trademark notice or other ownership legend or indication of confidentiality set forth on or contained in any of the Confidential Information;

        (iv) not disassemble or decompile software, or otherwise attempt to reverse engineer the design and function of any of the Confidential Information, or develop, manufacture, produce or distribute any software product(s) or offer any service derived from or which otherwise use any of the Confidential Information; and

        (v) promptly notify Disclosing Party in writing of any unauthorized use or disclosure of the Confidential Information, including a detailed description of the circumstances of the disclosure and the parties involved.

        (vi) advise its affiliates, officers, employees and agents that receive or have access to the Confidential Information that federal and state securities laws prohibit any person who has material non-public information concerning the Disclosing Party from purchasing or selling securities of the Disclosing Company or from communicating such information to any other person.

    (B)  Notwithstanding the provisions of Section 2(A) above, information and materials provided by Disclosing Party shall not be considered Confidential Information to the extent that: (a) Receiving Party can demonstrate that such information was known by Receiving Party prior to its disclosure by Disclosing Party; (b) such information came into the possession of Receiving Party, directly or indirectly, from persons who were not under any obligation to maintain the confidentiality of such information; (c) such information has become part of the public domain through no act or fault on the part of Receiving Party in breach of this Agreement; or (d) Receiving Party can

1

demonstrate that such information was independently developed by or for Receiving Party without the use of Confidential Information. Additionally, Receiving Party may disclose Confidential Information where reasonably required pursuant to legal process (e.g., subpoena), provided that in such instance the Receiving Party shall provide advance written notice of such event to Disclosing Party and cooperate with Disclosing Party to limit such disclosures to the maximum extent possible. Furthermore, neither party shall be precluded from independently developing technology or pursuing business opportunities similar to or in competition with those contemplated by this Agreement, provided that neither party shall make, have made, use or sell for any purpose any product, service or other item using, incorporating or derived from any Confidential Information of the other party.

3.    Term.  Receiving Party's obligations hereunder with respect to Confidential Information shall commence upon the Effective Date and, subject to the exceptions in Section 2(B) and subject to Section 7, shall survive for a period of three (3) years after the Effective Date. Except as the parties may otherwise agree in writing, Receiving Party shall return or certify the destruction of all Confidential Information when such information is no longer reasonably required for the Purpose of the Disclosure or, in any case, upon Disclosing Party's request.

4.    Definitive Agreement.  Neither party has an obligation under this Agreement to enter into any further business relationship with the other party.

5.    Indemnification and Equitable Relief. Receiving Party agrees to indemnify and hold Disclosing Party harmless from and against all claims, losses, liabilities, damages, expenses, and costs (including, without limitation, reasonable fees for attorneys, expert witnesses, and court costs) that result from a breach of this Agreement by Receiving Party. Receiving Party agrees that if it breaches this Agreement, Disclosing Party shall be entitled to an accounting and payment of all forms of compensation or benefits which Receiving Party directly or indirectly realizes as a result of such breach. Receiving Party agrees that any unauthorized use of the Confidential Information by Receiving Party may cause Disclosing Party irreparable harm for which remedies at law may be inadequate. Therefore, in addition to any other rights it may have at law, Disclosing Party shall be entitled to seek equitable relief.

6.    Warranty.  Disclosing Party warrants that it has the right to make the disclosures under this Agreement.  **NO OTHER WARRANTIES ARE MADE BY EITHER PARTY UNDER THIS AGREEMENT.  ANY INFORMATION EXCHANGED IS PROVIDED "AS IS" AND EACH PARTY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS, STATUTORY OR IMPLIED INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTIES OF MERCHANTIBILITY, TITLE OR FITNESS FOR A PARTICULAR PURPOSE.**

7.    General. This Agreement constitutes the entire agreement and understanding between the parties with respect to the use and disclosure of the Confidential Information, and supersedes all prior and contemporaneous negotiations, discussions and understandings of the parties, whether written or oral, with respect to such subject matter.  No waiver or modification of any of the provisions of this Agreement shall be valid unless in writing and signed by both parties.  Receiving Party's rights and obligations under this Agreement cannot be assigned to any third party without Disclosing Party's prior written consent and any attempted or purported assignment of this Agreement without such consent shall be void.  Both parties shall adhere to all applicable laws, regulations, and rules relating to the export of technical data, and shall not export or re-export any technical data, any products received from a Disclosing Party, or the direct product of such technical data to any proscribed country or person under such applicable laws, regulations or rules.  This Agreement does not create any agency or partnership relationship.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Georgia, excluding its choice of law provisions.  Should any provision of this Agreement be determined to be void, invalid or otherwise unenforceable by any court of competent jurisdiction, such determination shall not affect the remaining provisions hereof which shall remain in full force and effect.  The provisions of sections 4, 5, 6 and 7 shall survive any termination or expiration of this Agreement.

INTENDING TO BE LEGALLY BOUND, the persons signing this Mutual Confidentiality Agreement below represent and warrant that they are duly authorized to execute this Agreement on behalf of their respective company.

This Agreement is effective as of the 10th day of April, 2014 (the "Effective Date").

2

SIS, LLC

By: _____

Name: _J MAXWELL THOMAS_

Title: _EVP, PARTNER_

Stoneridge Software, Inc.

By: _____

Name: Eric Newell

Title: President

3

# EXHIBIT B

CONFIDENTIAL



**From:** S. Maxwell Thomas <smthomas@sisn.com>
**Sent:** Monday, July 14, 2014 8:03 AM
**To:** Scott Boedigheimer
**Cc:** Eric Newell
**Subject:** Agreement

We primarily agreed on billing and terms as well as the other issue,  with a year buffer on working on our clients directly.

I will send over documents today for your final review.

**Best Regards,**

*Max Thomas*

**S Maxwell Thomas**
**Partner, EVP Sales & Marketing**
SIS, LLC
(p) 678-336-8778
(c) 404-895-4760
www.sisn.com

1

STONERIDGE 000033

**From:** S. Maxwell Thomas
**Sent:** Tuesday, July 22, 2014 4:20 PM
**To:** Scott Boedigheimer <scott@stoneridgesoftware.com>; Eric Newell
<eric@stoneridgesoftware.com>
**Cc:** Mark Richmond <MRichmond@sisn.com>; Ravi Kannan <Rkannan@sisn.com>
**Subject:** RE: Agreements

This might work better.

**Best Regards,**

# Max Thomas

**S Maxwell Thomas**
**Partner, EVP Sales & Marketing**
**SIS, LLC**
**(p) 678-336-8778**
**(c) 404-895-4760**
www.sisn.com

---

**From:** Scott Boedigheimer [mailto:scott@stoneridgesoftware.com]
**Sent:** Monday, July 21, 2014 9:06 PM
**To:** S. Maxwell Thomas; Eric Newell
**Cc:** Mark Richmond; Ravi Kannan
**Subject:** RE: Agreements

Max,

I don't know if it was just me, but I didn't get any attachments.

Scott Boedigheimer | VP of Business Development | Stoneridge Software | Dynamics AX and NAV
Experts
d. 612-354-4989 m. 612-860-3594 e. scott@stoneridgesoftware.com w. www.stoneridgesoftware.com

---

**From:** S. Maxwell Thomas [mailto:smthomas@sisn.com]
**Sent:** Monday, July 21, 2014 2:33 PM
**To:** Scott Boedigheimer; Eric Newell

**Cc:** Mark Richmond; Ravi Kannan
**Subject:** Agreements

Scott,

Here are the signed and cleaned up agreements for your signature.

**Best Regards,**

## Max Thomas

**S Maxwell Thomas**

**Partner, EVP Sales & Marketing**

**SIS, LLC**

**(p) 678-336-8778**

**(c) 404-895-4760**

www.sisn.com







## SIS SUBCONTRACT SERVICES AGREEMENT

THIS AGREEMENT (the "Agreement") is made and entered into this 21 day of July, 2014, by and between SIS, LLC, a Delaware limited liability company (the "Company") and Stoneridge Software Inc., (the "Subcontractor").

WITNESSETH:

WHEREAS, the Company is desirous of engaging the Subcontractor to modify and refine certain codes and to perform related services (the "Software Services"). These Software Services are more particularly described in one or more Service Work Orders. Initial Service Work Order is attached hereto and by this reference incorporated herein. All subsequent Service Work Orders shall not invalidate any prior Service Work Orders, but shall have additive effect with all Service Work Orders combined defining the entire scope of work under this agreement. Each Service Work Order shall be executed in writing by the parties hereto.

WHEREAS, the Company and the Subcontractor are desirous of setting forth the terms and conditions of an independent contractor relationship with respect to the subject matter of this Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements herein set forth and to be performed by the parties hereto, the Company and the Subcontractor hereby agree as follows:

1. Services and Compensation. Subject to the terms and conditions of this Agreement, the Company hereby engages and retains the Subcontractor to provide the Software Services and the Subcontractor hereby agrees to provide the Software Services. The Subcontractor shall perform said Software Services in a professional manner consistent with industry best practices and standards. The Subcontractor will not have the authority to bind the Company for any debt or obligation and will not, through any words or actions; indicate otherwise to any person, firm, corporation, or other entity. In return for the performance of such services and for the covenants and agreements of the Subcontractor contained herein, the Company will pay to the Subcontractor such compensation, as more particularly described in each work order, attached hereto and by this reference incorporated herein, during the term of this Agreement.

2. Payment Terms.  The Subcontractor shall bill the Company for the services performed weekly, and no later than 45 days following the performance of the services being billed. The Subcontractor shall submit invoices identifying specific tasks being worked on, employee performing the work, dates the work was performed, and the specific Service Work Order which authorized the work to be performed. The Subcontractor will be paid for the work within 45 days of invoice. Any balances due over 45 days will be subject to a **1%** per month interest rate on the amount past due, unless otherwise mutually agreed upon..

3. Duties.   The Subcontractor will devote such business time and best efforts as may be necessary to fully and adequately perform and provide the Software Services.

4. Nondisclosure of Trade Secrets and Confidential Information.

(a) The Subcontractor understands that in the course of the Subcontractor's work with the Company, the Company may disclose to the Subcontractor Trade Secrets and Confidential Information, as said terms are defined in Section 3(b). The Company has expended substantial time, money, effort, and other resources to develop the Trade Secrets and Confidential Information which the parties acknowledge are very valuable and must receive the fullest practical protection and confidential treatment




to protect the Company's proprietary interest from irreparable damage.  The Subcontractor understands and expressly agrees that the Trade Secrets and Confidential Information, as well as any information of any kind obtained by the Subcontractor due to his performance of the Software Services and/or any other services provided to the Company in connection with or pursuant to this Agreement, are all confidential information, the disclosure of which could cause substantial and irreparable damage to the Company, the Company's business and the Company's customers and clients.  Therefore, the Subcontractor expressly agrees that he will not during the term of this Agreement and  for a period of three (3) years thereafter use or disclose any portion or all of the Trade Secrets and Confidential Information, except as otherwise authorized by the Company in writing.  The Subcontractor shall at no time copy, remove from the Company's premises or retain, without the Company's prior written consent, any Trade Secrets or Confidential Information, except as required in the normal operation of the Company's business.  Upon termination of this Agreement, the Subcontractor shall return to the Company, at the Subcontractor's expense, any and all Trade Secrets and Confidential Information then in the Subcontractor's possession.

(b) For purposes of this Agreement, the following terms shall have the following respective meanings:

(1)  "Trade Secret" shall mean any scientific or technical information, design, process, procedure, formula or improvement, or any portion or phase thereof, whether or not patentable, that is of value to the Company and is not generally known to competitors of the Company.  Trade Secrets shall include, but not be limited to, certain unpatented information relating to the manufacture or servicing of the Company's products, information concerning proposed new products, market feasibility studies, proposed or existing marketing techniques or plans, and methods the Company has developed for conducting its business.

(2)  "Confidential Information" shall mean any data or information, other than Trade Secrets, that is of value to the Company and is not generally known to competitors of the Company.  Confidential Information shall include, but not be limited to, lists, records, and files of the Company's current or potential customers, the identity of various suppliers and information about the Company's executives and employees.

(c) The Subcontractor understands and agrees that any disclosure by the Company of any Confidential Information or Trade Secret shall not constitute a grant by the Company to the Subcontractor of any right or license of the Confidential Information or Trade Secret under any trademark, copyright or patent.

(d)  If the performance by the Subcontractor of his obligations under this Agreement requires the Subcontractor to disclose any Confidential Information or Trade Secret to his employees or agents, the Subcontractor shall, prior to such disclosure, cause such employee or agent to enter into an agreement pursuant to which such employee or agent shall agree to protect such Confidential Information or Trade Secret at least to the extent set forth herein.  If the Subcontractor is required by law to disclose any Confidential Information or Trade Secret, the Subcontractor shall provide the Company with reasonable notice so that it may seek protective relief.



Great People, Process and Technology



Enterprise Resource Planning

(e)  The Subcontractor and the Company agree that any breach by the Subcontractor of the covenants contained in this Section 3 will result in irreparable injury to the Company, for which money damages could not adequately compensate.  Therefore, in the event of any such breach, in addition to any other rights and remedies which it may have at law or in equity, the Company shall be entitled to have an injunction issued by any court of competent jurisdiction enjoining and restraining the Subcontractor and/or any other person involved therein from continuing such breach.  The existence of any claim or cause of action which the Subcontractor may have against the Company or any other person shall not constitute a defense or bar to the enforcement of such covenants or any other provision of this Agreement.  If the Company is obliged to resort to the courts for the subject of litigation between the parties, then the running of the time period for the covenant specified in this Section 4 shall be suspended until a final nonappealable court order is issued with respect to such litigation.

5.  Independent Contractor.  Both the Subcontractor and the Company, in the performance of this Agreement, will be acting in their own separate capacities and not as agents, employees, partners, joint venturers or associates of one another.  It is expressly understood and agreed that the Subcontractor is an independent contractor of the Company in all manners and respects and that Subcontractor is not authorized to bind the Company to any liability or obligation or to represent that he has any such authority.  The Subcontractor shall be solely responsible for all of his withholding taxes, social security taxes, unemployment taxes, and workers' compensation insurance premiums.

6.  Ownership of Work Product.  All work product, property, data, documentation, information or materials conceived, discovered, developed or created by the Subcontractor pursuant to this Agreement (collectively, the "Work Product") shall be owned exclusively by the Company.  To the greatest extent possible, any Work Product shall be deemed to be a "work made for hire" (as defined in the United States Copyright Act, 17 U.S.C.A. §101 et seq., as amended) and owned exclusively by the Company.  To the extent that such Work Product does not constitute work made for hire, the Subcontractor hereby unconditionally and irrevocably transfers and assigns to the Company all right, title and interest in or to any Work Product.

7.  Intellectual Property Rights,  During the term of this Agreement, the Subcontractor may provide written materials to the Company to assist in the provision of the Software Services (the "Materials").  The Subcontractor hereby grants to the Company an irrevocable, non-exclusive, worldwide, fully paid up license to use and reproduce the Materials as necessary in connection with the Company's business activities.

8.  Term.  Either party may terminate this Agreement upon giving at least 10 days' prior written notice to the other party.  Notwithstanding such termination, whether it is at the instance of the Company or the Subcontractor, and regardless of the reasons therefore, the Subcontractor acknowledges and agrees that the covenants and agreements contained in this Agreement shall continue to be binding in accordance with the terms hereof.

The Company shall give the Subcontractor 30 days' notice if it intends to replace its resources on the project.  If the Subcontractor is not able to attain the billable hours agreed upon in any associated Statement of Work for a period of two months, they can withdraw their resources with 30 days' notice and all billable time during that period shall be paid in full in accordance with this agreement and any Statement of Work.

9.  Waiver of Breach.  The waiver by any party to this Agreement of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party hereto.10.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia in all respects.

11.  Entire Agreement.  This instrument contains the entire agreement between the parties regarding the subject matter of this Agreement.  It may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.  This Agreement may be executed in multiple counterparts, and any executed counterpart shall be deemed an original for all purposes, but all of such counterparts shall constitute one and the same instrument.



Great People, Process and Technology



**Microsoft** Partner

Enterprise Resource Planning

12. <u>Severability</u>.  The invalidity or unenforceability of any particular provision of this Agreement shall not affect its other provisions, and to that end the provisions of this Agreement shall be deemed severable.

13. <u>Employees</u>.  Current relationship of Company with its Employees, Subcontractors and or Agents is very valuable.   The Subcontractor agrees that Company will suffer significant loss if during the term of this Agreement, or within two (2) year afterwards, The Subcontractor hires any person employed or Contracted by SIS or any of its subsidiaries and/or affiliates during the term of this agreement.   If The Subcontractor does so, it will pay to the Company an amount equal to Fifty Thousand Dollars ($50,000) or 1 year's salary of the employee or Contractor, at the rate last paid that employee by the Company, whichever is greater.  Additionally, the Subcontractor shall not contract directly with the Company's employees for any services during the period of time that said person is employed or contracted with by the Subcontractor and for one (2) year thereafter.

14. <u>SIS Customers</u>.  Current relationship of Company with its customers is very valuable.   The Subcontractor agrees that Company will suffer irreparable loss if during the term of this Agreement, or within one (1) year afterwards, The Subcontractor contracts with any of Company's customers for whom the Company engaged Subcontractor to perform the Software Services to perform Competing Services.  "Competing Services" are any services or products offered for sale by the Company.  Subcontractor acknowledges and agrees that (i) the restrictions contained in this Section 14 are reasonable in scope and are necessary to protect the Company's legitimate interests in protecting its business, and (ii) any violation of the restrictions contained in this Section 14 will cause significant and irreparable harm to the Company for which the Company has no adequate remedy at law. Accordingly, in addition to any other remedies and damages available, Subcontractor acknowledges and agrees that Company may immediately seek enforcement of this Agreement by means of specific performance or injunction, without any requirement to prove actual damages or post a bond or other security.

The only exception to the above clause is if the customer that Company engages the Subcontractor with terminates their agreement with the Company for just cause, the Subcontractor will be free to do work directly with the Customer engaged by the Company one year after the termination of the agreement by said Customer with the Company.

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its authorized representative, and the Subcontractor has set forth his hand and seal, all as of the day and year first above written.

Subcontractor                                    SIS, LLC

By: _____          By: _____

Date: _____          Date: ___7/21/2014_____



# Statement of Work

Prepared for: SIS, LLC

Dated: June 27, 2014

Project Number: SIS-002

Author: Scott Boedigheimer

This Statement of Work is governed by the terms and conditions as set forth in the SIS Subcontract Services Agreement between Stoneridge Software and SIS, LLC dated ____ _____, the terms of which are explicitly referenced and incorporated herein.



# Statement of Work for SIS, LLC

**Project:**
This Statement of Work effective as of the date of signature on this document is between Stoneridge Software Inc. (Stoneridge Software) and SIS, LLC ("Customer").  It is agreed between the parties hereto that Stoneridge Software will provide consulting services toward the completion of the deliverables described in this statement of work.

The deliverables will be requested by Customer on an as-needed basis and outlined in Appendix A or a separate Work Order (if attached).

Any activities not specifically outlined herein as "deliverables" shall be considered outside the scope of this statement of work.   Further, any activities outlined herein and not specifically designated as activities to be performed by Stoneridge Software will be the sole responsibility of the Customer.   If Customer wishes Stoneridge Software to perform any such out of scope activities or Customer activities, Customer will follow the process for Scope Change Management outlined herein.  Any such work performed by Stoneridge Software will result in cost and expenses in excess of those estimated or budgeted, which costs and expenses will be charged on a time and materials basis as outlined in the Scope Change Management procedures herein.

**Description of Work:**
Customer has requested consulting and development related to various customer projects with The API Group.  Stoneridge Software will make its best effort to identify and mobilize the appropriate resources to meet the requirements.  In so doing, Stoneridge Software will appoint a project administrator as the point of contact who will be responsible for understanding the requirements, acquiring the appropriate resources with the necessary qualifications, monitoring the status and quality of the deliverables and administering the project on a billable basis.

When a requirement is identified, the Customer Project Owner will contact the Stoneridge Software point of contact identified below via email, to request a resource:

| Contact Name: | Eric Newell |
|---|---|
| Email: | eric@stoneridgesoftware.com |
| Phone: | (701) 371-4434 |

All resources will be assigned according to the presented materials.  Stoneridge Software will provide a 30 day notice if a resource needs to be transitioned and will provide the Customer the opportunity to review the replacement resource.

Customer is solely responsible for managing and coordinating work assignments to Stoneridge Software consultants.

**Timeline:**
Times are to be determined by individual request.

2



**Project Tasks, Deliverables, Estimates & Fees:**
This statement of work will be delivered to the Customer on a time and materials basis at the following rates:

| Description | Hourly Rate |
| --- | --- |
| Architect | $155 |
| Senior Functional Consultant | $155 |
| Senior Technical Consultant | $175 or packaged price |
| Functional Consultant | $155 |

Stoneridge Software consultants assigned to the project will be considered full-time dedicated to the project unless specifically identified as a "part-time" consultant.    SIS will consider the two team members from Stoneridge as if they are SIS APi Group team consultants in consideration of utilization and communication on the project and will keep Stoneridge as informed in the same manner as SIS team members in regards to schedules and project plan details.  Customer will be responsible for directing and managing the consultants' efforts and providing consultants with their tasks each week. Consultants will be responsible for summarizing their efforts in a manner that accurately reflects the tasks completed at the level of detail requested by the Customer.

Expenses will be billed at actual cost to the Customer and will be paid by Customer in accordance with the SIS Subcontract Services Agreement.  Customer understands that the above fee is based on the scope of work and the terms and conditions (including the Project Assumptions) described in the Agreement and this statement of work.  Therefore, Customer agrees that Stoneridge Software will have the right to charge additional fees or expenses on an hourly basis at Stoneridge Software's current rate in the event that: (i) Customer requires or requests any change in or modification to Stoneridge Software's services as described in this statement of work; (ii) one of more Project Assumptions cannot be met, thereby causing changes to Stoneridge Software's services or any delays to the schedule; or (iii) there is schedule slippage outside of Stoneridge Software's control which causes work to continue beyond the projected timeframe.

Stoneridge Software will invoice Customer for services and expenses in accordance with the Agreement. All reasonable out-of-pocket travel and living expenses incurred during the term of the project described will be reimbursable to Stoneridge Software by the Customer.

Travel time will be charged at $90 per hour for any time spent traveling to a customer-requested onsite at a location that requires more than an hour of travel from the Stoneridge Software employee's base location, with a maximum of $360 per leg of the trip.

Customer will be responsible to assign an internal Project Owner.  The Project Owner is the primary contact at the Customer for Stoneridge Software for the deliverables specified in this statement of work. The Project Owner and other key personnel will be reasonably available throughout the project to answer questions and validate approached put forward.  Stoneridge Software will make best attempts toward further progress on other items while answers may be forthcoming.

3



The Project Owner for the Customer on this project will be:

| Contact Name: | Mark Richmond |
|---|---|
| Email: | mrichmond@sisn.com |
| Office Phone: | 678.336.8770 |
| Mobile Phone: | 480-231-2380 |

Engagement Management: Ravi Kannan
Executive Sponsor: Max Thomas

In the event that there are any inaccuracies, disputes and/or problems with the products or services being billed, the Customer will immediately notify their Stoneridge Software point of contact listed above.

<u>Assumptions:</u>
In addition to being dependent upon the Project Assumptions contained elsewhere, any estimates, budgets or schedules for the project are based on the following Project Assumptions.  Any change to or failure of any Project Assumptions will require changes to the scope, fees and estimated timing described in this statement of work and may prevent Stoneridge Software from completing its services on the project successfully.

- **Project Management** – the Customer Project Manager will be available to assist the consultant when necessary
- **Site of Work** – all project work will be completed at an agreed upon location by Customer and Stoneridge Software
- **Software Rights and Format** – Customer will have purchased the software and have all media in the correct format necessary to begin the project, available on-site to Stoneridge Software upon initiation of the project.  Customer will have the appropriate staff on hand to assist with any technical issues
- **Technical Facilities and Resources** – Customer will provide Stoneridge Software with access to all hardware, software and technical support required for the project.  Any time spent by Stoneridge Software troubleshooting connections will be billable to the Customer and considered a Scope Change Request for the purposes of this statement of work
- **Third Parties** – all third party software and hardware will function properly
- **Language** – all project work and documentation will be performed in English
- **Training Facility** – if training is required, the Customer will provide a training facility with the appropriate computers, whiteboard, overhead projectors, pens and paper.  If a training facility is not available, Stoneridge Software will help to secure such a facility at the Customer's expense.
- **Changes** – Customer must review and request changes to all project deliverables in a timely manner
- **Adherence to Scope** – scope control is defined by and ultimately the responsibility of Customer and must be closely adhered to during this project.  As this is a time and materials agreement, the direction given by the Customer constitutes the scope of the engagement.

4



- **Regulatory Controls** – Stoneridge Software accepts no responsibility for legal and/or regulatory reporting that may relate to country, federal, state or local governments.  Customer must designate professionals that will maintain that control
- **Project Tasks** – Customer staff will provide direction to the Stoneridge Software consultants
- **Acceptance** – Customer will comply with the Acceptance criteria for any deliverables
- **Feedback** – After completion and acceptance, if a task was not completed to Customer's satisfaction, Customer will notify Stoneridge Software in writing within 10 business days of the completion of task

**Stoneridge understands that this engagement / project is subject to the same terms in the PSA (Professional Services Agreement) executed on June 24, 2014 between SIS LLC and APi Group Inc..  It is a requirement by the APi Group that all subcontractors to SIS are subject to the same terms in this PSA.**

**Acceptance:**
The acceptance criteria for any deliverables specified as part of a task request are as follows:

Stoneridge Software will notify Customer upon the completion of the task, known as the Notification Date.  The task and any associated deliverable(s) will be deemed to be accepted by the Customer within thirty (30) days from the Notification Date unless otherwise noted in writing to Stoneridge Software prior to the end of such thirty (30) day period.

Any notice of rejection must specify, in reasonable detail, in what manner the deliverable does not conform.  Stoneridge Software will work with Customer to come to agreement with respect to any such nonconformance and Stoneridge Software will correct such nonconformance within a reasonable time and manner.

**Authorization to Begin Work:**
This statement of work, together with the SIS Subcontract Services Agreement and any project descriptions attached thereto as exhibits, contains the entire understanding between the parties relating to the subject matter hereof and supersedes all prior oral or written agreements, proposals, representations and understandings between the parties relating to the subject matter hereof.

Delivery of consulting services will commence upon signature by both parties.  By signing below, Stoneridge Software and Customer agree to the above terms and conditions.

Please scan and email this authorization to the Stoneridge Software point of contact defined herein.

Stoneridge Software and Customer agree that a scanned copy of this executed letter will have the same force and effect as the original executed document.



SIGNATURES

| Stoneridge Software Inc | SIS, LLC |
|---|---|
| Name: Eric Newell | Name: S Maxwell Thomas |
| Signature: | Signature: |
| Title: President | Title: Partner |
| Date: | Date: 7-20-2014 |
| Address: 8401 Wayzata Blvd, Suite 300 | Address: 3950 Shackleford Road, Suite 195 |
| City/State: Minneapolis, MN | City/State: Duluth, GA |
| Postal Code: 55426 | Postal Code: 30096 |
| Country: USA | Country: USA |
| Phone Number: 612-354-4966 | Phone Number: 678.336.8770 |
| Email: eric@stoneridgesoftware.com | Email: smthomas@sisn.com |

**Schedule to be updated and provided by Mark Richmond on a weekly or bi-weekly basis.**

6

# EXHIBIT C



**From:** Eric Newell
**Sent:** Monday, August 4, 2014 9:11 AM
**To:** Mark Richmond; S. Maxwell Thomas (smthomas@sisn.com)
**Cc:** Scott Boedigheimer
**Subject:** API Group Opportunity CRM:0001184

Mark & Max –

Based on the change in the schedule and resources requested from our team, we do not plan to go forward with the subcontractor agreement to assist you with the implementation of the API Group. When we originally negotiated the deal, we expected it to be 3 people paid 40 hours per week for 21 months. What has resulted is 2 people extremely part-time through the Analysis phase and no promises for the future deployment of the project. Given the lower rate and uncertainty around the schedule, this just isn't an appealing opportunity for us - so we are going to step aside.

If you would like to request any payroll or other AX training from our team members, we'd be happy to work something out for that.

Best of luck with the implementation and let us know if you want to catch up when you're in Minneapolis. Let me know if you have any questions.

Thanks,
Eric

Eric Newell | President | Stoneridge Software
w. 612-354-4966 c. 701-371-4434 e. eric@stoneridgesoftware.com w. www.stoneridgesoftware.com

Stoneridge
software

[ enable your business ]

1

EXHIBIT

1