# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

SIS, LLC,

      Plaintiff,

                v.

STONERIDGE HOLDINGS, INC.; ERIC
NEWELL; and, SCOTT BOEDIGHEIMER,

      Defendants.

Civil Action No.
1:17-cv-01816-SDG

## <u>OPINION AND ORDER</u>

This case is before the Court on Defendants' Motion for Summary Judgment [ECF 99]; Plaintiff's Motion for Leave to File Matters Under Seal [ECF 121]; and, Defendants' Motion to Strike Plaintiff's Second Kershteyn Declaration [ECF 132]. Following a careful review of the record, and with the benefit of oral argument, Defendants' Motion for Summary Judgment is **DENIED IN PART AND GRANTED IN PART**. Specifically, Defendants' Motion for Summary Judgment is denied as to Counts I and VI, and granted as to the remaining counts. Further, Plaintiff's Motion for Leave to File Matters Under Seal is **GRANTED** and Defendants' Motion to Strike Plaintiff's Second Kershteyn Declaration is **DENIED**.

## I.      Factual Background

As a preliminary matter, Plaintiff failed to file a response to Defendants'

Statement of Material Facts [ECF 99-2], as required by the Local Rules. Pursuant

to LR 56.1(B)(2)(a):

> This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in L.R. 56.1(B)(1).

Defendants' reply brief even pointed to Plaintiff's failure to respond [ECF 104,

at 2], but Plaintiff never sought leave of Court to file an out-of-time response.

Consequently, all of the facts in Defendants' statement of facts are deemed to be

admitted to the extent they are properly supported by admissible evidence. *BMU,*

*Inc. v. Cumulus Media, Inc.*, No. 1:07-CV-3141-TCB, 2009 WL 10670253, at *1

(N.D. Ga. May 7, 2009) (quoting LR 56.1(B)(2)(a)(2)), *aff'd*, 366 F. App'x 47 (11th Cir.

2010) (affirming district court's admission of Defendants' statement of material

facts and holding that the plaintiff's statement of additional facts does not

constitute a response to the movant's statement of undisputed facts); *compare* Fed.

R. Civ. P. Advisory Notes, 2010 Amendments, Subdivision (e) (noting that "the

court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute").

The supported and undisputed facts in this action are as follows. Prior to 2014, APi Group, Inc. ("APi") started the process to replace its various software systems with an Enterprise Resource Planning ("ERP") software system, such as Microsoft Dynamics AX.[1] SIS submitted, and eventually won, a proposal for APi to adopt Microsoft Dynamics AX (the "Project").[2] Stoneridge has extensive experience with Microsoft Dynamics AX and has been recognized by Microsoft as an expert in the field.[3] In February 2014, SIS approached Stoneridge to work on the Project.[4] The parties began negotiating a deal for Stoneridge's work on the Project shortly thereafter. On the Stoneridge side, the negotiations between the two companies included Defendants Eric Newell, President, and Scott Boedigheimer, Vice President of Business Development.[5] On the SIS side, the

---

[1]   ECF 99-2, ¶ 4.

[2]   *Id.* ¶ 6.

[3]   *Id.* ¶ 1.

[4]   *Id.* ¶ 7.

[5]   *Id.* ¶ 11.

negotiations included SIS partners S. Max Thomas, Ravi Kannan, Mark Richmond, Mark Kershteyn, and Mark Klein.[6]

On April 2, 2014, a Stoneridge employee performed a demonstration for APi as part of SIS's final sales presentation to APi.[7] On April 8, SIS asked Stoneridge to provide training to SIS employees on the payroll function within Microsoft Dynamics AX.[8] On April 10, Stoneridge executed a Mutual Confidentiality Agreement ("MCA") with SIS "in order to discuss the APi project in more detail."[9]

On May 13, SIS sent the first draft of a standard SIS Subcontract Services Agreement ("SSA") to Stoneridge for review.[10] On May 15, 2014, APi formally selected SIS as its partner for the initial phases of the Project.[11] SIS informed Stoneridge of APi's decision on May 20.[12] In a series of emails on May 28, SIS provided Stoneridge a copy of the Work Order from APi and stated that the Project

---

[6]   *Id*. ¶ 12.

[7]   *Id*. ¶ 14.

[8]   *Id*. ¶ 17.

[9]   *Id*. ¶ 19.

[10]   *Id*. ¶ 22.

[11]   *Id*. ¶ 23; ECF 99-8, at 10.

[12]   ECF 99-2, ¶ 24.

was scheduled to begin in June 2014 and, therefore, SIS and Stoneridge needed to get their agreements in place.[13]

SIS and APi signed a Professional Services Agreement and a Work Order on June 20.[14] Those agreements expressly provided that APi was only obligated to continue with SIS through the initial, analysis phase of the Project.[15] After that phase, APi had sole discretion to decide whether to continue with SIS for the implementation phase of the Project.[16]

On May 29, Stoneridge asked SIS if it could draft "the consulting dollars and hours" on its Statement of Work ("SOW") template, which would then reference the SSA SIS had previously provided to Stoneridge.[17] On May 30, Stoneridge provided the first draft SOW to SIS.[18] The SOW references the SSA as the master document.[19] Stoneridge's draft proposed three full time employees at 3,200 hours

---

[13]   *Id.* ¶¶ 25–26; ECF 99-8, at 13–14.

[14]   ECF 99-2, ¶ 34; ECF 100-2.

[15]   ECF 99-2, ¶ 36.

[16]   *Id*.

[17]   ECF 99-8, at 25–26.

[18]   ECF 99-2 ¶ 13; ECF 99-8, at 36–41; ECF 99-3 (Newell Decl.), at 18–24 (Ex. C).

[19]   ECF 99-8, at 26–27.

each.[20] On June 12, SIS responded to the May 30 SOW and indicated, for the first time, that it would not commit to employing Stoneridge personnel full-time.[21]

On June 27, Stoneridge provided a revised SOW, which included a guaranteed average of 140 hours for a four week period, and a revised SSA.[22] In the email, Stoneridge emphasized that SIS's change to the SOW that stated it could not guarantee 40 hours a week was a "substantial change to [Stoneridge's] understanding of the agreement" and "[i]n order to move forward with this partnership, [Stoneridge] need[s] to have assurances that [it] would get an average of 35 per week for [its] dedicated resources on the project."[23] Following this June 27 email, SIS internally discussed the possibility that it might need to execute the project without Stoneridge.[24] Nevertheless, on July 3, SIS requested Stoneridge's presence for the APi kickoff event during the week of July 14.[25] On July 7, SIS

---

[20]   ECF 99-2, ¶ 13; ECF 99-8, at 41.

[21]   ECF 99-2, ¶ 32; ECF 99-3, ¶ 18.

[22]   ECF 99-2, ¶ 38; ECF 99-8, at 42; ECF 99-3 (Newell Decl.), at 38–63 (Ex. E).

[23]   ECF 99-8, at 42.

[24]   ECF 99-2, ¶ 39; ECF 99-13, at 9.

[25]   ECF 99-2, ¶ 40; ECF 99-14, at 2–3.

confirmed that Stoneridge's attendance at the kickoff event would be billable to SIS.[26]

On July 8, SIS sent new drafts of the SSA and SOW to Stoneridge, noting its hope that the parties could get the agreements "agreed upon and executed quickly."[27] The revisions included a one-year non-solicitation provision.[28] On July 11, 2014, Stoneridge sent SIS two emails regarding the July 8 SOW. The first asked for clarification regarding the amount of hours listed for Stoneridge employees under Appendix A.[29] The second noted the outstanding items remaining for negotiation.[30]

Following the first July 11 email, Richmond sent an email to Thomas and Kannan discussing other possibilities for filling the roles currently being negotiated with Stoneridge.[31] Nevertheless, SIS responded to Stoneridge's concerns on July 11, confirming the number of hours in Appendix A and noting

---

[26]   ECF 99-2, ¶ 41; ECF 99-14, at 2.

[27]   ECF 99-2, ¶ 42; ECF 99-8, at 67; ECF 99-3 (Newell Decl.), at 63–74 (Ex. F).

[28]   ECF 99-2, ¶¶ 42–43; ECF 99-3, ¶ 21.

[29]   ECF 99-8, at 90.

[30]   *Id.* at 92.

[31]   ECF 99-2, ¶ 46; ECF 99-13, at 7 ("I know the relationship with Stoneridge is important, but if I had to scramble I could also fill the other positions.").

that it would try to work through the other concerns raised.[32] On July 14, SIS sent Stoneridge a revised SSA and SOW.[33] In the email, SIS noted that it had "primarily agreed to the changes [Stoneridge] requested."[34] The July 14 SOW provided for two Stoneridge employees who would work as full time team members on the Project.[35]

SIS alleges, and Stoneridge disputes, that the parties agreed to all material terms as written in the July 14 SOW during a call on July 21, 2014.[36] Following the call, Thomas emailed Stoneridge stating, "Here are the signed and cleaned up agreements for your signature."[37] However, he mistakenly did not attach the

---

[32]   ECF 99-8, at 89–96.

[33]   ECF 99-2, ¶ 51; ECF 99-8, at 111; ECF 99-3 (Newell Decl.), at 74–94 (Ex. G).

[34]   ECF 99-8, at 111.

[35]   *Id.* at 118.

[36]   ECF 102-1, ¶ 3; ECF 102-2 (Kershteyn Decl.), ¶ 6 ("The Parties' concluded negotiations in a final phone call on July 21, 2014 attended by Newell, Boedigheimer, Thomas, and me."). Defendants object to SIS's articulation of the call and point to Newell's Declaration that claims that he did not speak with anyone from SIS regarding the SOW on July 21. ECF 106, at 4; ECF 99-3, ¶ 29. Accordingly, there is a genuine issue of material fact regarding the occurrence and substance of the call based on the parties' conflicting declarations.

[37]   ECF 99-8, at 122.

agreements.[38] Thomas sent another email on July 22 attaching the SSA and SOW signed by SIS.[39] These agreements contained the same terms as the July 14 drafts.

The July 22 SOW provides that "Delivery of consulting services will commence upon signature by both parties."[40] SIS alleges that it "assumed the Agreement and corresponding [SOW] were promptly executed by Defendants or soon would be."[41] It is undisputed that Stoneridge never signed the agreements.

On July 29, Stoneridge submitted an invoice for work done for SIS on July 23, 24, and 25.[42] The parties dispute whether the work listed on that invoice was in performance of the Project. In Newell's Supplemental Declaration, he notes that a Stoneridge employee, Wally Carr,[43] began work on July 23 "at the specific request of SIS" to set up a Configuration Tracker that Stoneridge had "recommended SIS use on the APi implementation."[44] Newell claims that the Configuration Tracker

---

[38]   ECF 99-2, ¶ 54; ECF 99-8, at 122.

[39]   ECF 99-2, ¶ 55; ECF 99-8, at 124–135.

[40]   ECF 102-1, ¶ 4.

[41]   *Id.* ¶ 3.

[42]   ECF 99-3, at 16.

[43]   Carr was also the Stoneridge employee who attended the July 14 kickoff event. ECF 99-2, ¶ 52. Kristy Loeks, another Stoneridge employee, attended some of the sessions remotely. *Id.*

[44]   ECF 104-1, ¶¶ 8–9.

is "a general tool . . . without any specific value to a customer until information has begun to be entered into it" and the set up was "performed directly for SIS, for its benefit—and not as part of an implementation for APi Group."[45] Carr's Declaration also states that he assisted SIS in setting up the Configuration Tracker for SIS's benefit and not as part of the implementation for APi.[46]

On August 4, 2014, Stoneridge informed SIS via email that it did not intend to move forward with the Project.[47] In the email, Newell states:

> Based on the change in the schedule and resources requested from our team, we do not plan to go forward with the subcontractor agreement to assist you with the implementation of the APi Group. When we originally negotiated the deal, we expected it to be 3 people paid 40 hours per week for 21 months. What has resulted is 2 people extremely part-time through the Analysis phase and no promises for the future deployment of the project. Given the lower rate and uncertainty around the schedule, this just isn't an appealing opportunity for us—so we are going to step aside.
>
> If you would like to request any payroll or other AX training from our team members, we'd be happy to work something out for that.

---

[45]   *Id.* ¶¶ 10, 11.

[46]   ECF 104-2, ¶ 9.

[47]   ECF 99-2, ¶ 56; ECF 99-8, at 136.

> Best of luck with the implementation and let us know if
> you want to catch up when you're in Minneapolis. Let
> me know if you have any questions.[48]

Thomas forwarded Newell's August 4 email to Jim Westerman at Microsoft noting

the following:

> FYI: Stoneridge will not be on the project as it turns out.
> They were not supplying us with much experience, and
> we have now hired more experienced consultants, so it
> will not negatively affect things. The fact that they
> surprised us with this tells me they probably do not want
> to give up the right to compete with us in the future at
> APi.[49]

After the August 4 email, Stoneridge connected with APi at a trade show,[50]

and SIS's and APi's working relationship began to decline.[51] On February 4, 2015,

APi exercised its option not to continue onto Phase II of the Project with SIS.[52] Also

in February 2015, APi hired Stoneridge to review work by SIS, complete the

analysis phase begun by SIS, and move on to the implementation phase of the

Project.[53]

---

[48]   ECF 99-8, at 136.

[49]   ECF 99-2, ¶ 57; ECF 99-8, at 136.

[50]   ECF 99-2, ¶ 58.

[51]   *Id.* ¶¶ 66–75.

[52]   *Id.* ¶ 75.

[53]   *Id.* ¶ 76.

## II.    Procedural History

SIS initiated this action on May 19, 2017.[54] The operative Complaint in this matter is the Second Amended Complaint ("SAC"), which was filed with leave of Court on July 17, 2018.[55] The SAC asserts the following claims: Breach of Contract against Defendant Stoneridge, Count I; Promissory Estoppel against Defendant Stoneridge, Count II; Negligent Misrepresentation against all Defendants, Count IIII; Fraud against all Defendants, Count IV; Tortious Interference with Economic Advantages against all Defendants, Count V; and, Misappropriation of Trade Secrets against all Defendants, Count VI.[56] On July 31, 2018, Defendants moved to dismiss all counts as to Stoneridge except for Count VI, and all counts as to the individual defendants.[57] On February 5, 2019, the Court granted Defendants' motion to dismiss Count V (tortious interference) and denied the motion as to all other counts and the individual defendants.[58]

---

[54]    ECF 1.

[55]    ECF 55.

[56]    *Id.*

[57]    ECF 58.

[58]    ECF 66.

Discovery ended in April 2019 and the parties' dispositive motions were due in June 2019.[59] However, due to confusion between the parties regarding certain discovery deadlines, the Court entered an Order on November 5, 2019 granting leave for Defendants to file a motion for summary judgment within 21 days from that date.[60] On November 26, Defendants filed their motion for summary judgment.[61] SIS filed its response on December 10.[62] In its response, SIS argued that the Court's November 5 Order limited Defendants' ability to file a summary judgment motion to the breach of contract count.[63] Based on that argument, SIS did not provide a response to any of Defendants' arguments regarding the other counts.

Following a failed settlement conference, the Court set Defendants' motion for summary judgment for oral argument.[64] In its Notice Setting Oral Argument, the Court addressed SIS's scope argument and stated that, given the parties' opportunity to present arguments orally, Defendants' motion would be heard in

---

[59]   ECF 97, at 1–2.

[60]   *Id.*

[61]   ECF 99.

[62]   ECF 102.

[63]   *Id.* at 2–3.

[64]   ECF 115.

its entirety.[65] The Notice invited SIS to supplement its response prior to oral argument to address the non-breach of contract counts.[66] SIS did not file a supplemental response.

The Court held oral argument on June 16, 2020. During the hearing, it became clear that SIS's counsel did not read the Notice and counsel stated that she was not prepared to present argument on the entirety of Defendants' motion.[67] Following oral argument, the Court granted SIS's request to file a supplemental response addressing the non-breach of contract counts.

On June 24, SIS filed its Supplemental Response.[68] As part of its response, SIS filed exhibits purportedly supporting its factual claims, including Kershteyn's Second Declaration,[69] and a Supplemental Statement of Material Facts.[70] On July 8, Defendants filed their Supplemental Reply Brief.[71] Defendants also filed an

---

[65]   *Id.*

[66]   *Id.*

[67]   *See* ECF 119.

[68]   ECF 120.

[69]   ECF 122-2, at 1–7.

[70]   ECF 123.

[71]   ECF 129.

objection to SIS's Supplemental Statement of Material Facts[72] and an objection to and/or motion to strike Kershteyn's Second Declaration.[73]

## III.   Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment,

---

[72]   ECF 131.

[73]   ECF 130; ECF 132.

"and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## IV.   Count I: Breach of Contract

Defendants argue that the parties never formed a contract because there was no meeting of the minds as to a material term, the scope of Stoneridge's work, and Stoneridge never executed a subcontract agreement.[74] In response, SIS argues that there is a genuine issue of material fact on the issue of contract formation.[75] Specifically, SIS argues that there is a genuine dispute as to whether the companies mutually agreed to the terms either on July 14 or July 21, 2014.[76] Alternatively, the

---

[74]   ECF 99-1, at 5, 7.

[75]   ECF 102, at 3.

[76]   *Id.* at 4.

parties dispute whether Defendants' actions between July 23 and August 4 constitute acceptance of a counteroffer by performance.

### a.    Legal Standard

The parties agree that Georgia law controls this contract dispute. Under Georgia law, "a valid contract includes three elements: subject matter of the contract, consideration, and mutual assent by all parties to all contract terms." *Thompson v. Floyd*, 310 Ga. App. 674, 681 (2011) (citation omitted); *see* O.C.G.A. § 13-3-1 ("To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."). "Thus, unless and until there is the mutual assent of the parties to all essential terms, there is no complete and enforceable contract." *Extremity Healthcare, Inc. v. Access to Care Am., LLC,* 339 Ga. App. 246, 251 (2016) (citing *TranSouth Fin. Corp. v. Rooks*, 269 Ga. App. 321, 323 (2004)).

In Georgia, mutual assent "requires '(a) a meeting of the minds (b) on the essential terms of the contract.'" *Regan v. Stored Value Cards, Inc.*, 85 F. Supp. 3d 1357, 1362 (N.D. Ga.) (citing John K. Larkins, Jr., *Georgia Contracts: Law and Litigation* § 3:2 (2d ed. 2019 update)), *aff'd,* 608 F. App'x 895 (11th Cir. 2015).

> In determining whether there was a mutual assent, "courts apply an objective theory of intent whereby one

> party's intention is deemed to be that meaning a
> reasonable man in the position of the other contracting
> party would ascribe to the first party's manifestations of
> assent, or that meaning which the other contracting party
> knew the first party ascribed to his manifestations of
> assent."

*Legg v. Stovall Tire & Marine, Inc.*, 245 Ga. App. 594, 596 (2000) (quoting *Cox Broad. Corp. v. Nat. Collegiate Athletic Assn.*, 250 Ga. 391, 395 (1982)). "'In making that determination, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement, and courts are free to consider such extrinsic evidence.'" *Regan*, 85 F. Supp. 3d at 1363 (quoting *Frickey v. Jones*, 280 Ga. 573, 630 (2006)). "Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury." *Legg*, 245 Ga. App. at 596; *see also* Larkins, *supra*, § 3:3.50 ("Unlike other issues of contract law, the issue of assent generally is not susceptible to summary judgment.").

**b.    Discussion**

Under the facts presented here, there are two ways the parties may have entered into a contract: (1) the parties entered into an oral agreement on July 21 that was memorialized in SIS's July 22 email and accompanying attachments; or, (2) the July 22 agreements constituted a counter offer that Stoneridge accepted by

performance.[77] The Court finds that a genuine issue of material fact exists regarding whether Stoneridge mutually assented to an oral agreement on July 21. Accordingly, the Court need not address SIS's acceptance by performance argument.

As detailed above, SIS first approached Stoneridge about the Project on February 2014.[78] Stoneridge was involved in SIS's final sales presentation to APi in April 2014.[79] In May 2014, after SIS was chosen for the Project by APi, the parties began drafting the terms of their agreement for the Project.[80]

As part of negotiating the agreement, the parties exchanged multiple draft SOWs. The first draft SOW was prepared by Stoneridge and provided to SIS on May 30.[81] On June 12, SIS sent back its revisions to Stoneridge's SOW.[82] On June

---

[77] To the extent SIS claims that the parties entered into an agreement on July 14, the Court rejects this argument. SIS asserts that the parties agreed to all material terms on July 14. ECF 102, at 6. However, the evidence shows only that SIS provided another round of draft agreements to Stoneridge on that day. SIS has not pointed to any actions by Stoneridge from that day that could support a finding that Stoneridge mutually assented to the draft agreements.

[78] ECF 99-2, ¶ 7.

[79] *Id.* ¶ 14.

[80] *Id.* ¶¶ 23, 25.

[81] *Id.* ¶ 13; ECF 99-8, at 36–41; ECF 99-3 (Newell Decl.), at 18–24 (Ex. C).

[82] ECF 99-2, ¶ 32.

27, Stoneridge provided a revised SOW.[83] On July 8, SIS sent Stoneridge a revised

SOW.[84] Following further discussions via email, on July 14, SIS sent Stoneridge a

revised SOW.[85] SIS claims that the parties then discussed the revisions via a call

on July 21.[86] On July 22, SIS emailed copies of the allegedly finalized agreements

to Stoneridge.[87] These agreements contain the same language as the agreements

provided by SIS on July 14. Following this email, the parties ceased negotiations

until August 4 when Stoneridge informed SIS that it did not intend to work with

SIS on the Project.[88]

Stoneridge claims that there is no contract because it never executed the

written agreements and the parties never mutually assented to a material term,

namely, the number of Stoneridge employees slated to work on the Project.[89]

---

[83]  *Id.* ¶ 38; ECF 99-8, at 42; ECF 99-3 (Newell Decl.), at 38–63 (Ex. E).

[84]  ECF 99-2, ¶ 42; ECF 99-8, at 67; ECF 99-3 (Newell Decl.), at 63–74 (Ex. F).

[85]  ECF 99-2, ¶ 51; ECF 99-8, at 111; ECF 99-3 (Newell Decl.), at 74–94 (Ex. G).

[86]  ECF 102-1, ¶ 3.

[87]  ECF 99-8, at 124–135.

[88]  *Id.* at 136.

[89]  In support of this argument, Stoneridge's motion relies heavily on *Yim v. Carr*, 349 Ga. App. 892 (2019). In *Yim*, the Georgia Court of Appeals found that there was no binding settlement because, in an attempt to accept the settlement offer, the responding party changed an essential element of the offer. *Id.* However, the issue before the Court is not whether Stoneridge attempted to accept an offer with materially altered terms. Rather, it is whether Stoneridge entered

Stoneridge claims that its earlier communications with SIS make clear that it would never have agreed to limit their work to two employees. On the other hand, SIS claims that the communications between the parties prior to July 21, the lack of communication following Thomas's July 22 email, and the work of Stoneridge employees from July 23 to August 4 supports an inference that the parties reached an oral agreement during the July 21 call.[90]

As a preliminary matter, the Court notes that the fact that Stoneridge never signed the July 22 agreements does not bar a finding of mutual assent. As explained by the Georgia Court of Appeals:

> While circumstances indicating that the parties intended to prepare a subsequent writing is strong evidence that they did not intend to be bound by a preliminary agreement, contrary evidence bearing upon the parties' intent to be bound and reflecting the existence of a binding oral agreement presents a question of fact for the jury's determination. *See Denton v. Etheridge,* 73 Ga. App. 221, 225–226(2) [ ] (1945). Moreover, "[a]lthough the parties contemplated the future execution of a written . . . agreement, the jury was authorized to find that a binding oral agreement was in effect, and the failure to sign the written instrument did not affect the validity of the oral

---

into an oral agreement on the July 21 teleconference. In their reply brief, Defendants appear to argue that *Yim* supports the notion that the August 4 email was a rejection of the offer. ECF 104, at 5–6. However, SIS alleges that Stoneridge entered into an oral contract during the July 21 teleconference, prior to the August 4 email. Therefore, *Yim* is inapposite.

90   ECF 102, at 8–9.

> agreement." (Citation and punctuation omitted.) *Gen. Hosps. of Humana [v. Jenkins]*, 188 Ga. App. [825, 827(1) (1988)]; *Merry [v. Ga. Big Boy Mgmt. Inc.]*, 135 Ga. App. [707, 708(1) (1975)]. *See also Barton v. Chemical Bank*, 577 F.2d 1329, 1336 (5th Cir. 1978) ("At common law an oral contract may be enforceable despite the contemplation of a subsequent written contract.") (applying Georgia law); *Pacrim Assocs. [v. Turner Home Entertainment, Inc.]*, 235 Ga. App. [761, 765–766(1) (1998)].

*Turner Broad. Sys., Inc. v. McDavid*, 303 Ga. App. 593, 601 (2010); *see also Doss & Assocs. v. First Am. Title Ins. Co.*, 325 Ga. App. 448, 452 (2013) (finding that "assent to the terms of a contract may be given other than by signatures" and "assent may be implied from the circumstances") (citations omitted).[91]

Since the lack of Stoneridge's signature is not conclusive, the Court must address the evidence presented by the parties to see if an objectively reasonable person could find that Stoneridge mutually assented to all material terms during

---

[91] In Defendants' reply brief and during oral argument, they point to *Moreno v. Strickland*'s holding that, where the parties disagree on whether an oral agreement was reached, the agreement must be memorialized in writing to be enforceable. 255 Ga. App. 850 (2002). Defendants claim no such writing exists in this case. First, it is not clear that *Moreno* applies since it—and the cases it cites to for support—dealt with settlement agreements entered into by the parties' attorneys. *Id*. Second, to the extent it may apply, Defendants have not shown why the July 22 SSA and SOW fail to satisfy this writing requirement. Defendants appear to claim that the writing must be provided by the party seeking non-enforcement, but *Moreno*'s holding does not go that far, and Defendants have not provided any other support for that assertion.

the July 21 teleconference. In order to do so, it may look to extrinsic evidence and, "[w]here such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury." *Legg*, 245 Ga. App. at 596.

The extrinsic evidence provided by both parties creates a genuine dispute of material fact concerning whether they reached an oral agreement during the July 21 call. During oral argument and in Newell's Declaration, Defendants argued that the July 21 call did not occur.[92] In contrast, SIS provided Boedigheimer's email to Newell referencing the July 21 call and Kershteyn's Declaration claiming that the call occurred and the parties reached an oral agreement during it.[93] Kershteyn's Declaration alone is "sufficient to require a jury determination of whether there had in fact been a meeting of the minds." *Regan*, 85 F. Supp. 3d at 1363 (citation omitted); *see also Netsoft Assocs., Inc. v. Flairsoft, Ltd.*, 331 Ga. App. 360, 363 (2015) (collecting cases holding that conflicting affidavits create issues of material fact). However, the circumstances surrounding the call also support the conclusion that there is a genuine issue of material fact as to Defendants' mutual assent.

---

[92]   ECF 99-3 (Newell Decl.), ¶ 29.

[93]   ECF 122-2, at 3 (Ex. B); ECF 102-2, ¶ 6.

First, on July 11, Newell sent SIS an email highlighting the three "outstanding items" regarding the agreements.[94] Those included: (1) billing frequency; (2) the non-solicitation agreement; and, (3) the amount of work to be performed by Stoneridge employees.[95] Thomas responded to those concerns that same day and, according to SIS, SIS conceded on some of Stoneridge's requests between the July 8 and July 14 drafts. The notion that SIS conceded to Stoneridge's requests is supported by Thomas's July 14 emails, the first of which stated, "[w]e primarily agreed on billing and terms as well as the other issue, with a year buffer on working on our clients directly. I will send over documents today for your final review."[96] His second email attached the agreements and stated, "[we] have primarily agreed to the changes you requested. Please review."[97] Thus, a reasonable person could find that the concessions made by SIS satisfied Stoneridge's remaining concerns, leading Stoneridge to orally assent to the July 14 agreements during the July 21 call.

---

[94]   ECF 99-8, at 92.

[95]   *Id.*

[96]   *Id.* at 109.

[97]   *Id.* at 111. During oral argument, SIS's counsel attempted to claim that the "we" in Thomas's email referred to Stoneridge and SIS. However, Kershteyn's Declaration expressly clarifies that the "we" refers to SIS. ECF 102-2, ¶ 4 ("We [SIS] primarily agreed . . . .").

Stoneridge's previous concerns regarding the number of employees and hours does not necessarily show that it would never have agreed to two full time employees for the Project. In fact, Stoneridge's concern about the amount of work seemed to focus on the hours per team member rather than the number of team members.[98] Thus, when combined with SIS's assertions that the July 14 drafts contained concessions to Stoneridge, it is plausible that the requirement of two full team members satisfied Stoneridge's concern about limited hours. Furthermore, the July 14 draft added the following paragraph to the non-solicitation term that appears to favor Stoneridge:

> The only exception to the above clause is if the customer that Company [SIS] engages the Subcontractor [Stoneridge] with terminates their agreement with the Company for just cause, the Subcontractor will be free to do work directly with the Customer engaged by the Company one year after the termination of the agreement by said Customer with the Company.[99]

Accordingly, a reasonable person could find that Stoneridge agreed to these new terms. This conclusion is further supported by the fact that Stoneridge apparently

---

[98]  *See, e.g.*, ECF 99-8, at 42 ("The change to the SOW where you can't guarantee 40 hours a week is a substantial change to our understanding of the agreement.").

[99]  *Id.* at 115.

did not follow up on Thomas's July 11 emails, responding to Newell's concerns, or Thomas's July 14 email, providing the newly revised agreements.

Additionally, the Court finds Stoneridge's two-week silence following the July 21 call significant. Thomas's July 22 email clearly implied SIS's understanding that the parties had reached an agreement. Given the consistent negotiations and discussions between the parties from the end of May to July 22, which increased in July due to SIS's stated desire to execute the agreements quickly, Stoneridge's silence following Thomas's July 22 email could be reasonably construed as showing Stoneridge's mutual assent to the terms of the SOW signed by SIS. *See Fed. Paper Bd. Co. v. Harbert-Yeargin, Inc.*, 92 F. Supp. 2d 1342, 1351 n.16 (N.D. Ga. 1998) ("Defendant's argument that negotiations were ongoing is undermined by the fact that there is no evidence of any discussions between plaintiff and defendant concerning the alleged contract after April 11.").

Finally, even if Carr's work during that time period was not in performance of the agreements, the fact that the same Stoneridge employee who had attended the kickoff event began work to set up the Configuration Tracker tool for SIS to use in implementation of Microsoft Dynamics AX during that two-week silence further supports SIS's claim that the parties mutually assented to the contract during the July 21 call. The email exhibits filed with Carr's declaration show that

on July 28, Richmond emailed the Project team members regarding the upcoming "APi Requirements Schedule."[100] Wally Carr and Kristy Loeks from Stoneridge were included in that email.[101] On August 4, Carr emailed a Senior Application Consultant from SIS, Asoka Perera, stating, "It looks as though the powers that be are moving Kristi and I to other projects."[102] Also on August 4, Richmond emailed Carr telling him, "please check with your firm's management on this project— we've received notice today that, effective immediately, you are no longer on the project. Please stop billable work immediately and forward Asoka any materials that you may have that would be pertinent to the project."[103]

The Court finds that Defendants are not entitled to summary judgment because a genuine issue of material fact exists as to whether the parties entered into an oral contract. Defendants' motion for summary judgment as to Count I is **DENIED**.

---

[100]  ECF 104-2, at 7.

[101]  *Id*.

[102]  *Id*. at 10.

[103]  *Id*. at 9.

## V.    Defendants' Objections to SIS's Supplemental Statement of Material Facts and Kershteyn's Second Declaration

Before addressing the remaining counts, the Court must consider Defendants' objections to part of SIS's supplemental filings. Defendants object to SIS's Supplemental Statement of Material Facts by claiming that it goes beyond the Court's Order permitting additional briefing.[104] Defendants also assert that it improperly groups large paragraphs of information together and the information is (1) unsupported, (2) supported by citations that do not actually support the claim, or (3) otherwise inadmissible.[105] Defendants contend that Kershteyn's Second Declaration should be stricken because it goes beyond the Court order allowing the supplemental briefing by presenting new evidence into the record and it contains speculations and conclusions, as well as inadmissible hearsay.[106]

The Court rejects Defendants' claim that these filings extend beyond the Court's Order granting SIS leave to file a supplemental response. By necessity, the Order granted leave for SIS to file evidence in support of the claims therein because Rule 56 requires the parties to provide support for their factual positions. *See* Fed. R. Civ. P. 56(c).

---

[104]  ECF 131, at 1–3.

[105]  *Id.* at 3.

[106]  ECF 132.

The Court **DENIES** Defendants' motion to strike Kershteyn's Second Declaration [ECF 132] and the overarching objections thereto and to the Supplemental Statement of Material Facts. However, the Court will consider Defendants' specific objections when relevant; and, to the extent specific portions of SIS's supplemental briefing do not comply with Rule 56's evidentiary requirements, such portions will not be considered.

## VI.    Count II: Promissory Estoppel

SIS's alternative promissory estoppel theory of liability argues that Defendants promised to refrain from contracting directly with SIS's customers for a period of one year after the termination of the parties' subcontract agreement.[107] SIS asserts the promise was made during a call on or about July 14, 2014 and during a July 21 call when Stoneridge allegedly agreed to be bound by the written terms of the SSA.[108] Defendants argue that, regardless of whether this promise was made during the alleged July 14 call, SIS's claim fails because SIS did not provide Stoneridge with access to any sensitive or confidential information after July 14,

---

[107]   ECF 55, ¶ 38.

[108]   *Id.*

and there is no evidence that SIS suffered pecuniary losses as a result of changing its position in reliance on the alleged promise.[109]

SIS responds that it provided Defendants with confidential information following the July 14 call by pointing to the following evidence: (1) Stoneridge's July 21 invoice time entries for work during the kickoff event; (2) invoices from July 23–25; and, (3) information allegedly provided by SIS to Newell and two senior consultants during the July 21 call about SIS's "confidential implementation strategy" for the Project.[110] SIS asserts that it invested more than $340,000 and hundreds of man hours to develop the confidential implementation strategy.[111] In response to Defendants' lack-of-pecuniary-loss argument, SIS points to the $340,000 investment in its confidential implementation strategy and the more than $7.22 million profit earned by Defendants through their work with APi as evidence.[112] In their reply brief, Defendants contend that SIS's evidence is insufficient to show specific confidential information shared *after* July 14 and detrimental reliance, which requires a substantial change in position.[113]

---

[109]   ECF 99-1, at 13–14.

[110]   ECF 120, at 4–5.

[111]   *Id.* at 5.

[112]   *Id.* at 7–8.

[113]   ECF 129, at 3–4. Defendants' supplemental reply brief attempts to make the

a.     **Legal Standard**

Georgia law recognizes promissory estoppel claims in O.C.G.A. § 13-4-44,[114]

which provides:

> (a) A promise which the promisor should reasonably
> expect to induce action or forbearance on the part of
> the promisee or a third person and which does induce
> such action or forbearance is binding if injustice can
> be avoided only by enforcement of the promise. The
> remedy granted for breach may be limited as justice
> requires.

---

additional arguments that SIS has not established that an actual promise was
made and, relatedly, that any reliance on the non-established promise was
unreasonable. *Id.* at 4–5. This argument was not raised in Defendants' initial
motion, which claimed that "*putting aside* the truth of [SIS]'s allegation
regarding the existence of or contents of the alleged July 14th phone call . . ."
SIS did not rely on that promise. ECF 99-1, at 13 (emphasis added). Since this
argument was not raised in the original motion, preventing SIS from having
the opportunity to respond, the Court will not address it. *Reliance Ins. Co. of
Illinois v. Richfield Hosp. Servs., Inc.*, 92 F. Supp. 2d 1329, 1332 (N.D. Ga. 2000)
("In general, a court should not consider arguments raised for the first time in
a reply brief."). However, the Court notes that it is skeptical SIS would be able
to show that it *reasonably* relied on a sufficiently clear promise by Stoneridge
during the alleged July 14 call given that the parties were still negotiating their
written agreements at that point.

[114] The SAC does not refer to a specific statute in support of its promissory
estoppel claim. However, subsequent filings have made clear that SIS asserts
this claim under O.C.G.A. § 13-4-44. *E.g.*, ECF 120, at 3.

"Promissory estoppel claims are extremely fact specific and are not susceptible to application of general rules." *DPLM, Ltd. v. J.H. Harvey Co.*, 241 Ga. App. 219, 220 (1999) (citation omitted).

> To succeed on a promissory estoppel claim, the claimant must show: "(1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiffs to rely on such promise; (3) the plaintiffs relied on such promise to their detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment by surrendering, forgoing, or rendering a valuable right."

*Funderburk v. Fannie Mae*, No. 1:13-CV-01362-LMM, 2015 WL 11216690, at *3 (N.D. Ga. Nov. 16, 2015), *aff'd*, 654 F. App'x 476 (11th Cir. 2016) (quoting *Rental Equip. Grp., LLC v. MACI, LLC*, 263 Ga. App. 155, 157 (Ga. Ct. App. 2003)). Only "[d]etrimental reliance which causes a substantial change in position will constitute sufficient consideration to support promissory estoppel." *Robinson v. SunTrust Mortg., Inc.*, 785 F. App'x 671, 678 (11th Cir. 2019) (quoting *Clark v. Byrd*, 254 Ga. App. 826, 828 (2002)).

### b.    Discussion

In order to succeed on its promissory estoppel claim, SIS must show that (1) Defendants promised not to compete with SIS's customers for a year after the termination of the parties' subcontract agreement; (2) Defendants reasonably

expected SIS to rely on that promise; (3) SIS relied on that promise to its detriment; and (4) injustice can only be avoided by enforcement of the promise. The Court finds that SIS cannot show it detrimentally relied on the alleged promise and, therefore, Defendants are entitled to summary judgment on this count.

In order to show that it detrimentally relied on the alleged promise, SIS must show a substantial change in position stemming from the promise. SIS asserts that it substantially changed its position by providing confidential information to Defendants regarding APi or the Project that it otherwise would not have shared.[115] However, in comparing the information SIS provided to Defendants before and after July 14, the Court finds that SIS has failed to show a substantial—if any—change.

The record evidence shows that Stoneridge was aware of APi's identity and involved in the Project as early as April 2, 2014, when a Stoneridge employee performed a demonstration for APi as part of SIS's final sales pitch.[116] SIS and Stoneridge entered into a confidentiality agreement, the MCA, on April 10 to discuss the Project in more detail.[117] On May 28, SIS provided a copy of the Work

---

[115]  ECF 120, at 3.

[116]  ECF 99-1, at 13.

[117]  ECF 99-2, at 5. *See* ECF 99-3, at 10–12 (MCA).

Order from APi to Stoneridge.[118] The email exchange shows that Stoneridge had discussed the implementation plan with SIS prior to receiving the Work Order.[119] Thus, the record shows that SIS shared confidential information with Defendants prior to the alleged July 14 promise.

The confidential information shared with Defendants after the alleged promise is not substantially different from the confidential information already provided. First, SIS claims that the July 21 invoice shows a difference in the type of information shared with Defendants.[120] The invoice shows that Stoneridge employees were included in meetings discussing the Project during the kickoff event. However, SIS has failed to show that the information provided in those meetings differed from the information previously provided to Stoneridge. SIS's Statement of Material Facts explains that the kickoff event covered the use of the project management tool to be used on the Project (Compass), and the requirements set by APi in its Request for Proposal ("RFP").[121] SIS does not argue

---

[118]   ECF 99-2, ¶ 26; ECF 99-8, at 13–14; ECF 99-8, at 15–25 (Work Order).

[119]   ECF 99-8, at 13 (email from Newell to SIS asking if the pilot implementation discussed in the Work Order affected the overall implementation plan or if the plan was still as the parties had "previously discussed").

[120]   *Id.* at 3–4.

[121]   ECF 102-1, ¶ 5.

that APi's RFP was confidential *and* not previously available to or shared with Defendants. Further, the Work Order previously provided to Defendants had already identified Compass as the project management tool for the Project.[122]

SIS next points to the July 23–25 invoice as evidence showing that a senior Stoneridge consultant (Carr) began building the software system for the Project.[123] However, SIS does not state what confidential information was shared with Carr to build this system. Furthermore, the undisputed evidence regarding the general nature of the Configuration Tracker that Carr was working on during this time does not support an inference that he required or was given confidential information to build the tool.[124]

SIS also claims that a SIS project manager provided Newell and two other Stoneridge employees information "gleaned from" SIS's confidential implementation strategy during a July 21 call.[125] In support of this assertion, SIS provides Kershteyn's Second Declaration. Defendants assert that Kershteyn's testimony regarding the information provided during this call is inadmissible

---

122   ECF 99-8, at 25.

123   ECF 120, at 4.

124   ECF 104-1, ¶¶ 8–9; ECF 104-2, ¶¶ 7–11.

125   ECF 120, at 5.

hearsay because Kershteyn did not participate in the call. Regardless of the admissibility of this evidence, Kershteyn's Second Declaration fails to provide specific details about the type of confidential information provided and how that information substantially differed from previous information provided to Defendants.

Moreover, other portions of Kershteyn's Second Declaration support a finding that the confidential information provided on this call was not substantially different from the information provided prior to July 14. In describing the email from Jim Westerman of Microsoft to Boedigheimer on April 15, 2014,[126] Kershteyn states, "[l]ike the information imparted by [SIS] to Defendants in the internal kickoff/knowledge transfer meetings and in Newell's call with the project manager, this information was gleaned from [SIS]'s multiyear sales cycle in which it invested hundreds of thousands of dollars and hundreds of man hours."[127] SIS claims it did not give Westerman permission to share that information with Defendants.[128] However, SIS did ultimately provide much of this

---

[126] Defendants object to the consideration of this email. It is referenced here not for the contents of the email itself, but for Kershteyn's description of the email. The Court addresses the document's admissibility *infra* in Section VIII.b.i.

[127] ECF 120-1, ¶ 9.

[128] *Id.*

information to Defendants on May 28 when it supplied them with a copy of the Work Order.[129] Therefore, according to Kershteyn's declaration, similar information "gleaned" from SIS's multiyear sales cycle was provided to Defendants by SIS prior to July 14.

The Court finds that SIS has failed to show that it detrimentally relied on Defendants' alleged promise because the information provided to Defendants before and after the promise did not substantially differ. Accordingly, Defendants' motion for summary judgment on Count II is **GRANTED**.

## VII.   Counts III and IV: Negligent Misrepresentation and Fraud

SIS's claims for negligent misrepresentation and fraud are based on the same contentions as its promissory estoppel claim. SIS alleges that Defendants negligently misrepresented and/or fraudulently agreed on or about July 14 or 21 to refrain from contracting with SIS's customers for a period of one year following the termination of the subcontract.[130] Defendants argue that the negligent misrepresentation claim fails because it (1) is not pled with the particularity required under Rule 9(b);[131] (2) there is no evidence of statements made by

---

[129]  ECF 99-8, at 13–25 (Work Order). *Compare* ECF 122-2, at 14–15 (Westerman's email) *and* ECF 99-8, at 22.

[130]  ECF 55, ¶¶ 42, 46.

[131]  The Court has already twice denied Defendants' assertion that these counts

Defendants Newell and Boedigheimer giving rise to this claim; (3) Defendants cannot be held liable in tort for violating a contractual term in a contract to which it never agreed; (4) there is no evidence Stoneridge agreed to this provision; (5) and, even if it had agreed, SIS did not rely on that agreement and was not injured by it.[132] Defendants raise largely the same objections to SIS's fraud count with the additional argument that a promise of future conduct cannot serve as the basis for fraud.[133]

### a.    Legal Standard

"Under Georgia law, the tort of negligent misrepresentation consists of [three] elements: (1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance." *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1030 (11th Cir. 2003) (citing *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426 (1997)). "[T]he tort of fraud consists of five elements: '(1) false representation by defendant; (2) scienter; (3) intent to induce the plaintiff to act or

---

should be dismissed for failing to satisfy Rule 9(b)'s particularity standard. *See* ECF 54, at 8; ECF 66, at 13–14.

[132]   ECF 99-1, at 14–19.

[133]   *Id.* at 21.

refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff.'" *Id.* at 1027 (quoting *Ades v. Werther*, 256 Ga. App. 8, 11 (2002)).

"[T]he same principles apply to both fraud and negligent misrepresentation . . . ." *Artzner v. A & A Exterminators, Inc.*, 242 Ga. App. 766, 771–72 (2000) (quoting *Real Estate Intl v. Buggay*, 220 Ga. App. 449, 452 (1996)); *see also Ellis*, 318 F.3d at 1030 ("[T]he reasonable reliance that is required to state a negligent misrepresentation claim is equivalent to that needed in the fraud context.").

### b.    Discussion

The Court finds that SIS failed to satisfy the reliance element necessary to these claims. In support thereof, SIS proffered the same evidence raised in support of its promissory estoppel claim.[134] As explained above, the evidence presented by SIS fails to show that SIS detrimentally relied on the alleged promise because it did not change the type of confidential information being shared with Defendants following the promise. The Court likewise finds that SIS has failed to carry its burden on the reliance element for its negligent misrepresentation and fraud

---

[134] ECF 120, at 13 ("Defendants assert [SIS] did not change its status based on a false promise to honor the [SSA]. . . . This argument fails for the same reasons the same argument fails in the context of [SIS]'s promissory estoppel claim.").

claims. *See Home Depot U.S.A., Inc. v. Wabash Nat. Corp.*, 314 Ga. App. 360, 373 n.10 (2012) (finding that "to the extent that [the plaintiff's] promissory estoppel claim was predicated on the same alleged representations forming the basis for its fraud and negligent misrepresentation claims," it failed for the same reasons). Accordingly, the Court **GRANTS** Defendants' motion for summary judgment on Counts III and IV.

## VIII.  Count VI: Misappropriation of Trade Secrets

SIS alleges that it provided trade secrets and confidential information in the context of the confidential relationship governed by the MCA and the SSA, and Defendants misappropriated that information.[135] SIS contends that Defendants used that information to obtain APi's business, and, as a result, SIS suffered damages exceeding $7 million.[136] Defendants counter that they are not in the possession of information from SIS that could be considered a trade secret.[137] Further, they allege that, even if the information qualified as a trade secret,

---

[135]  ECF 55, ¶¶ 53–55.

[136]  *Id.* ¶ 56.

[137]  ECF 99-1, at 22.

Defendants did not misappropriate that information, and APi's dismissal of SIS was completely unrelated to Defendants.[138]

### a.   Legal Standard

The Georgia Trade Secret Act ("GTSA") is codified under O.C.G.A. § 10-1-760 *et seq.*[139] To prove a claim under the GTSA, a plaintiff must establish that "(1) it had a trade secret and (2) the opposing party misappropriated the trade secret." *Cap. Asset Rsch. Corp. v. Finnegan*, 160 F.3d 683, 685 (11th Cir. 1998) (quoting *Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp.*, 139 F.3d 1396, 1410 (11th Cir. 1998)). "The party asserting the existence of a trade secret has the burden of proving that the information so qualifies and that the accused party violated the Act." *Id.* at 685. "Whether a particular type of information constitutes a trade secret under the GTSA is ordinarily a question of fact. However, the Court can determine that the information at issue is not a trade secret as a matter of law if there is no evidence in the record to support [Plaintiff]'s claim." *Coal. Am., Inc. v. Nat'l Health Benefits Corp.*, No. 1:03-CV-4012-CC, 2009 WL 10664900, at *3 (N.D. Ga. Feb. 6, 2009) (citations omitted).

---

[138]  *Id.* at 24–25.

[139]  The SAC does not state the basis for SIS's trade secrets cause of action, but the parties briefing refers to the GTSA. ECF 99-1, at 22; ECF 120, at 14.

Trade secrets are defined under O.C.G.A § 10-1-761(4):

> (4) "Trade secret" means information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> > (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Thus, in order to show that the information qualifies as a trade secret, a plaintiff must show the following elements: "(i) information not commonly known by or available to the public, (ii) which derives economic value from not being generally known to or ascertainable by proper means by others who can obtain economic value from the information; and (iii) that was subject to reasonable efforts to maintain its secrecy." *EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1224–25 (N.D. Ga. 2014), *aff'd*, 703 F. App'x 803 (11th Cir. 2017).

A defendant misappropriates a trade secret under O.C.G.A. § 10-1-761(2)(B) when "it discloses or uses a trade secret of another, without express or implied

consent, knowing that at the time of disclosure or use the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) (citations omitted). A non-disclosure agreement can be the basis for imposing the duty not to disclose. *Id.* "'Acquisition,' 'disclosure,' or 'use' of a trade secret is a question of fact." *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1338 (N.D. Ga. 2007) (citing *Penalty Kick*, 318 F.3d at 1292 n.6).

 **b.** **Discussion**

  *i.* **Admissibility of Exhibit H**

 Prior to addressing the parties' arguments on this count, the Court must resolve Defendants' objection to Exhibit H of SIS's supplemental response.[140] Exhibit H is relevant to both of Defendants' objections because it contains an email chain between SIS and Microsoft regarding the "APi Operations Scope Documents" that a Microsoft employee, Jim Westerman, forwarded to Boedigheimer on April 15, 2014.[141] Westerman's email notes, "Also, please don't let Max know I shared this with you. He tends to be very sensitive and secretive.

---

[140] ECF 122-2, at 12–18.

[141] *Id.*

So I don't want to lose my source of information on this deal."[142] Boedigheimer forwarded the email to other Stoneridge employees, including Newell, that same day.[143] Additionally, Boedigheimer re-forwarded the email on January 14, 2015 to Newell and others noting, "Additional info regarding API group. None of these items has come up in our discussions with them. We are talking with them tomorrow about the outliers like these items. I will make sure to have these items on my list."[144] The substance of these emails is highly relevant to whether SIS took reasonable efforts to maintain the secrecy of its trade secrets and whether Defendants misappropriated SIS's trade secrets by using the information to garner APi's business.

Defendants object to the use of this email by claiming that it constitutes inadmissible hearsay and has not been authenticated.[145] Accepting that the email constitutes hearsay for purposes of this argument,[146] the Court finds that it may

---

[142] *Id.* at 13. "Max" presumably refers to Maxwell Thomas, who is the originating author of this email chain.

[143] *Id.*

[144] *Id.*

[145] ECF 131, at 14.

[146] Westerman's statement that Thomas "tends to be sensitive and secretive," is arguably hearsay to the extent it is offered to show SIS's reasonable efforts to maintain secrecy. However, it is not clear that Boedigheimer's January 14 email constitutes hearsay to the extent it is not being offered for the truth, but

consider the email nonetheless because "it could easily be 'reduced to admissible evidence at trial or reduced to an admissible form,' say, by 'hav[ing] the hearsay declarant testify directly to the matter at trial.'" *Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 324 F. Supp. 3d 1269, 1278 (N.D. Ga. 2018) (quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012)), *reconsideration denied*, No. 1:15-CV-1665-RWS, 2018 WL 10396435 (N.D. Ga. Dec. 26, 2018), *aff'd*, No. 19-11852, 2020 WL 2188667 (11th Cir. May 6, 2020). Defendants have not argued that the email is incapable of being presented in an admissible form at trial; therefore, the Court overrules this objection. *See Rindfleisch v. Gentiva Health Servs., Inc.*, No. 1:10-CV-3288-SCJ, 2015 WL 12551173, at *6 (N.D. Ga. Oct. 28, 2015) ("Plaintiffs make no argument that this information cannot be reduced to admissible evidence at trial and the Court will consider it."); *Gen. Elec. Cap. Corp.*, 2010 WL 11597655, at *4 ("The Court cannot determine, at this point, that Plaintiff will not be able to reduce the e-mail and the statement contained in Mr. Wingate's first declaration to admissible form at trial. The Court therefore overrules this objection for purposes of the instant Motions.").

---

rather to show Defendants' potential misappropriation of SIS's trade secrets. Defendants have failed to provide an explanation for why the email would constitute hearsay in this context.

Further, Defendants' attempt to question the authenticity of the emails is unavailing. "[C]ircumstantial evidence can be relied upon to show the authenticity of a document, 'including the document's own distinctive characteristics and the circumstances surrounding its discovery.'" *U.S. for Use & Ben. of WFI Ga., Inc., v. Gray Ins. Co.*, 701 F. Supp. 2d 1320, 1332 (N.D. Ga. 2010) (quoting *U.S. v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990)), *aff'd sub nom. U.S. ex rel. Cap. Computer Grp., LLC v. Gray Ins. Co.*, 453 F. App'x 905 (11th Cir. 2011). Here, SIS contends and Defendants do not deny that the email was produced by Stoneridge.[147] This is further supported by the fact that the document bears the following Bates numbers: STONERIDGE 000602–607. "Because the emails were produced by [Defendants] during the discovery process, the circumstances surrounding their discovery indicate authenticity." *Gray Ins. Co.*, 701 F. Supp. 2d at 1332 (citing *Sklar v. Clough*, No. 1:06–CV–0627–JOF, 2007 WL 2049698, at *4 (N.D. Ga. 2007)). Accordingly, the Court will consider the evidence.

### ii.    Trade Secret

Defendants claim that the information it received was either not a trade secret, or not entitled to trade secret protection because SIS failed to take

---

[147]   ECF 134, at 18.

reasonable efforts to maintain its privacy.[148] The Court rejects both these arguments.

First, SIS properly identified the applicable trade secrets in the SAC.[149] In summary, the trade secrets include confidential information regarding APi, the Project, SIS's capabilities, particularized software implementation strategies and techniques, and the Work Order.[150] Further, contrary to Defendants' assertions, the record evidence shows countless emails and communications between the parties discussing the Project and at least one specific example of a compilation of confidential information being shared with Defendants (the Work Order).[151] Therefore, the Court finds that SIS identified the purported trade secrets with sufficient detail.

Defendants do not provide any support for their broad assertion that "information regarding APi's needs, the Project, and [SIS]'s abilities with respect to the Project" cannot constitute a trade secret under Georgia law.[152] Nor does the Court find this argument persuasive. SIS's compilation of information regarding

---

[148]   ECF 99-1, at 24.

[149]   ECF 55, ¶ 34.

[150]   *Id.*

[151]   ECF 99-8, at 13–25.

[152]   ECF 99-1, at 24.

APi and the Project, collected for the purpose of gaining APi's business, has clear economic value to SIS derived from not being generally known or readily ascertainable to other companies competing with SIS for APi's business. The advantage a competing company would receive in knowing and using this information is apparent. Accordingly, the Court finds that the confidential information regarding APi, the Project, and SIS's implementation plan may qualify as trade secrets so long as SIS took reasonable efforts to maintain their secrecy.

The Court finds that there is a genuine issue of material fact as to whether SIS took reasonable efforts to maintain the secrecy of its trade secrets. It is undisputed that SIS shared APi's identity with Defendants and a Stoneridge employee performed a demonstration for APi as part of SIS's sales pitch prior to the parties entering into the MCA. However, APi's identity is not a purported trade secret; rather, the potential trade secrets are the compilation of information about APi and the Project. SIS asserts that the Stoneridge employee participating in the sales pitch did not receive such information as his role was to demonstrate "a discrete functionality of the Microsoft software (Enterprise portal)."[153] Defendants have not provided any evidence to the contrary. Thus, based on the

---

[153]   ECF 120, at 18; ECF 99-6, at 6–7.

evidence before the Court, SIS did not share any trade secrets with Defendants prior to entering into the MCA.[154]

Defendants next assert that the purported trade secrets are not covered by the MCA.[155] In support, they idly cite to the entire MCA without identifying where the document excludes such trade secrets. However, the express language of the MCA covers "lists of and information about . . . customers, potential customers, and associated statistical and financial information; . . . sales, marketing, business and strategic plans; and other significant and valuable business information that would otherwise be considered to be 'trade secrets' under applicable law."[156] Thus, it appears to cover exactly the type of information SIS is claiming qualifies as a trade secret.

In addition to relying on the MCA to show it protected the confidentiality of its trade secrets, SIS asserts that it stored such information only on password protected devices and shared this information only with those involved in the

---

[154] In contrast, SIS's claim that it did not share trade secrets until after it believed Defendants had agreed to the non-compete clause, ECF 120, at 17, is not supported by the evidence. As discussed above, SIS shared the Work Order with Defendants prior to the alleged promise not to compete. This fact is not determinative, however, because the MCA was in place.

[155] ECF 99-1, at 24.

[156] ECF 99-3, at 10 (MCA).

sales pitch who needed to know—all of whom were subject to non-disclosure agreements, such as the agreements in place with Stoneridge and Microsoft.[157] Further, SIS's own consultants were subject to non-disclosure and non-compete agreements.[158] Finally, when forwarding confidential information regarding the APi Project provided by Max Thomas, Westerman asked Boedigheimer to keep the fact that he is sharing the information secret because Thomas "tends to be very sensitive and secretive."[159] This email provides circumstantial evidence of the emphasis SIS placed on secrecy when dealing with its trade secrets. Accordingly, the Court finds that the totality of the measures taken by SIS creates a genuine issue of material fact as to the reasonableness of SIS's efforts to maintain the secrecy of its trade secrets.

### iii.   Misappropriation

There is also an issue of material fact as to whether Defendants misappropriated SIS's trade secrets. On January 14, 2015, Boedigheimer forwarded the email from Westerman containing SIS's alleged trade secrets to Newell and

---

[157]   *See id.* at 10-12; ECF 122-2, at 53-55 (Microsoft Non-Disclosure Agreement).

[158]   ECF 120, at 17 (citing ECF 120-1 (Kershteyn's Second Declaration), ¶ 10 (Ex. A)). Defendants did not specifically object to ¶ 10 of Kershteyn's Second Declaration. Further, the Court finds that Kershteyn would be competent to testify on these issues given his oversight of the Project.

[159]   ECF 122-2, at 13.

others. In the email, Boedigheimer states, "Additional info regarding API group. None of these items has come up in our discussions with them. We are talking with them tomorrow about the outliers like these items. I will make sure to have these items on my list."[160] According to Defendants' Statement of Material Facts, APi separated from SIS on February 4, 2015.[161] Further, "APi retained Stoneridge to review work by SIS, and to proceed with a 9-week project to complete the analysis phase begun by SIS, before moving to the implementation phase of the project" in February 2015.[162]

Given the language in the email and the undisputed timeline, a reasonable trier of fact could conclude that Stoneridge used the confidential information provided to it through its relationship with SIS to secure APi's business. Such a use would constitute a misappropriation of SIS's trade secrets. *See Diamond Power*, 540 F. Supp. 2d at 1340 (N.D. Ga. 2007) ("There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret. . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' . . . .'") (quoting *Penalty*

---

[160] *Id.*

[161] ECF 99-2, ¶ 75.

[162] *Id.* ¶ 76.

*Kick*, 318 F.3d at 1292). Accordingly, SIS has provided sufficient evidence to create a genuine issue of material fact as to whether Defendants misappropriated its purported trade secrets.

In their supplemental reply brief, Defendants acknowledge that the Westerman email chain is evidence of potential misappropriation.[163] They then argue that this "sole evidence" of misappropriation is "circumstantial (at best)" and "cannot contradict the direct evidence provided by [Defendant] Newell in his Declaration in support of Defendants' Motion for summary judgment."[164] However, Defendants fail to cite to the portion of Newell's Declaration that the email allegedly contradicts. Upon its own review, the Court finds that the declaration does not address the allegations of misappropriation. As such, Defendants have not provided any direct evidence to contradict the circumstantial evidence provided by SIS.

Finally, Defendants' assertion that it was not on notice that the email from Westerman contained trade secrets is unavailing.[165] Westerman's email expressly

---

[163]   ECF 129, at 14–15.

[164]   *Id.* at 15.

[165]   *Id.* at 13 ("Stoneridge was not on notice and could not have ascertained from the email that any information shared by Microsoft regarding the APi Project was subject to trade secret protection.").

notes the secretive nature of the information being shared.[166] This was echoed by Boedigheimer when he originally forwarded the email to other Stoneridge employees and noted, "[w]e need to keep this confidential."[167] Thus, viewing the evidence in the light most favorable to SIS, there is at least a question of material fact as to whether Defendants misappropriated SIS's purported trade secrets.

In sum, the Court finds that genuine issues of material fact exist regarding whether SIS took reasonable efforts to protect its alleged trade secrets and whether Defendants misappropriated those alleged trade secrets by using them to gain APi's business over SIS. Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Count VI.

## IX.   Conclusion

Defendants' motion for summary judgment [ECF 99] is **DENIED IN PART** and **GRANTED IN PART**. The motion is **DENIED** as to Counts I and VI. The motion is **GRANTED** as to Counts II, III, and IV. The parties are hereby **DIRECTED** to file their Proposed Consolidated Pretrial Order regarding the remaining counts within 30 days after entry of this Order. To the extent SIS is still seeking discovery of Stoneridge's functional design documents, the parties should

---

[166]   ECF 122-2, at 13.

[167]   *Id.*

present their respective positions (in 500 words or less, consistent with the Court's Standing Order concerning discovery disputes) in the Proposed Consolidated Pretrial Order.

Defendants' Motion to Strike SIS's Second Kershteyn Declaration [ECF 132] is **DENIED**. For good cause shown, SIS's Motion for Leave to File Matters Under Seal [ECF 121] is **GRANTED**. The Clerk is **DIRECTED** to seal ECF 122 and its attachments.

**SO ORDERED** this the 20th day of August 2020.

Steven D. Grimberg
United States District Court Judge